# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

_____

### 2014-1609, -1610

IVERA MEDICAL CORPORATION,

*Plaintiff-Appellant,*

*v.*

EXCELSIOR MEDICAL CORPORATION,

*Defendant-Appellee.*

*Appeals from the United States District Court for the Southern District of California in No. 3:11-cv-01115-HRBB and 3:12-cv-01581-H-RBB, Judge Marilyn L. Huff.*

----------------------------------------------------------------------

### 2014-1613, -1614

IVERA MEDICAL CORPORATION,

*Plaintiff-Appellant,*

*v.*

HOSPIRA, INC.,

*Defendant-Appellee.*

*Appeals from the United States District Court for the Southern District of California in Nos. 3:11-cv-01246- HRBB and 3:12-cv-01582-H-RBB, Judge Marilyn L. Huff.*

*(CAPTION CONTINUED INSIDE)*

## BRIEF FOR PLAINTIFF-APPELLANT

DANIEL H. BROMBERG
BRIAN C. CANNON
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
(650) 801-5000

KATHLEEN M. SULLIVAN
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
kathleensullivan@quinnemanuel.com

*Counsel for Plaintiff-Appellant Ivera Medical Corporation*

*CAPTION CONTINUED*

----------------------------------------------------------------------

**2014-1615, -1616**

IVERA MEDICAL CORPORATION,

*Plaintiff-Appellant,*

*v.*

CATHETER CONNECTIONS, INC.,

*Defendant-Appellee.*

*Appeals from the United States District Court for the Southern District of California in Nos. 3:12-cv-00954-HRBB and 3:12-cv-01587-H-RBB, Judge Marilyn L. Huff.*

# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant certifies the following:

**1.     The full name of every party or amicus represented by me is:**

Ivera Medical Corporation.

**2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

N/A.

**3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

Ivera Medical Corporation has no parent corporation, and no publicly held company owns 10 percent or more of Ivera Medical Corporation's Stock.

**4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or are expected to appear in this court are:**

<u>Quinn Emanuel Urquhart & Sullivan, LLP:</u> Daniel H. Bromberg, Brian C. Cannon, Kathleen M. Sullivan, and Bill Trac

<u>X-PATENTS, APC:</u> Jonathan Hangartner

<u>Jones Waldo Hollbrook & McDonough, PC</u>: Nathan D. Thomas

Dated: October 24, 2014                   Respectfully submitted,

                                          By: /s/ Daniel H. Bromberg
                                          Daniel H. Bromberg
                                          QUINN EMANUEL URQUHART
                                            & SULLIVAN, LLP
                                          555 Twin Dolphin Drive, 22nd Floor
                                          Redwood Shores, CA 94065
                                          Telephone: (650) 801-5000
                                          Facsimile: (650) 801-5100
                                          danbromberg@quinnemanuel.com

                                          *Attorneys for Plaintiff-Appellant*
                                          *Ivera Medical Corporation, Inc.*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ............................................................i

TABLE OF AUTHORITIES ............................................................vi

STATEMENT OF RELATED CASES ............................................. viii

PRELIMINARY STATEMENT ...........................................................1

JURISDICTIONAL STATEMENT ......................................................4

STATEMENT OF THE ISSUES...........................................................5

STATEMENT OF FACTS ....................................................................5

    A.    The Ivera Patents-In-Suit ..................................................5

    B.    Background Of The Patent.................................................8

        1.    The Need To Disinfect Catheters................................8

        2.    The Invention .............................................................9

        3.    The PTO Proceedings ...............................................11

        4.    Commercialization ....................................................12

    C.    The Prior Art ...................................................................13

        1.    The Hoang Sealed Disinfecting Cap.........................13

        2.    The White Coupling System......................................14

        3.    The Chin-Loy Multi-Purpose Cap ............................15

        4.    The Expectations Of Those Of Ordinary Skill At The Time of Invention.....................................................17

    D.    The District Court's Summary Judgment Ruling ...............18

SUMMARY OF ARGUMENT ..........................................................20

# TABLE OF CONTENTS—cont'd

**Page**

STANDARD OF REVIEW .......................................................23

ARGUMENT ........................................................................23

I.      THE DISTRICT COURT ERRED IN RULING THE PATENTS-IN-SUIT OBVIOUS AS A MATTER OF LAW DESPITE A GENUINE ISSUE WHETHER A SKILLED ARTISAN WOULD HAVE BEEN MOTIVATED TO ADD VENTS TO THE PRIOR ART DISINFECTING CAPS ...............................................................25

        A.      The Prior Art Did Not Include A Disinfecting Cap With Vents To Facilitate Evaporation And To Inhibit Pressure Buildup ..............26

        B.      It Would Not Be Obvious To Combine The Pertinent Elements Of The Prior Art To Make The Invention Because The Invention Does Not Use Vents For Functions Established In The Prior Art ...................................................................29

        C.      Adding Vents To The Prior Art Disinfecting Cap Defied The Conventional Wisdom That Catheter Assemblies Should Be Fluid-Tight...............................................................33

        D.      The District Court Erred In Ruling the Patents In Issue Obvious Based on Unexplained Assertions Of "Common Sense"....................37

II.     THE DISTRICT COURT ALSO ERRED IN GRANTING SUMMARY JUDGMENT OF OBVIOUSNESS BECAUSE IT FAILED TO PROPERLY CONSIDER OR CREDIT OBJECTIVE INDICIA OF NON-OBVIOUSNESS ...........................................39

        A.      The District Court Erred In Determining That The Patents-In-Suit Were Obvious Before Considering Objective Indicia Of Non-Obviousness ...............................................................40

        B.      The District Court Also Erred In Ruling That The Compelling Objective Indicia Of Non-Obviousness In The Record Failed To Raise A Genuine Issue Concerning Obviousness..........................43

CONCLUSION ........................................................................48

# TABLE OF CONTENTS—cont'd

**Page**

CERTIFICATE OF COMPLIANCE ..................................................................49

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page**

### Cases

*Alco Standard Corp. v. Tennessee Valley Authority*,
808 F.2d 1490 (Fed. Cir. 1986) ........................................................41

*Amgen, Inc. v. F. Hoffman-La Roche, Ltd.*,
580 F.3d 1340 (Fed. Cir. 2009) ........................................................33

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)............................................................................23

*Bettcher Industrial, Inc. v. Bunzl USA, Inc.*,
661 F.3d 629 (Fed. Cir. 2011) ........................................................24

*Cont'l Can Co. USA, Inc. v. Monsanto Co.*,
948 F.2d 1264 (Fed. Cir. 1991) ......................................................46

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Lit.*,
676 F.3d 1063 (Fed. Cir. 2012) .................................38, 40, 41, 43, 44

*Graham v. John Deere Co. of Kansas City*,
383 U.S. 1 (1966)..............................................................24, 37, 40, 45

*Green Edge Enterprises, LLC v. Rubber Mulch Etc., LLC*,
620 F.3d 1287 (Fed. Cir. 2010) ......................................................24

*In re Kahn*,
441 F.3d 977 (Fed. Cir. 2006) ........................................................38

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*
751 F3.d 1327, (Fed. Cir. 2014) ................................................24, 33

*KSR International Co. v. Teleflex, Inc.*,
550 U.S. 398 (2007)..........................................................30, 33, 37

*Microsoft Corp. v. i4i Ltd.*,
131 S. Ct. 2238 (2011)......................................................................24, 36

*Mintz v. Dietz & Watson, Inc.*,
679 F.3d 1372 (Fed. Cir. 2012) ..........................................38, 40, 45

*Monarch Knitting Machine Corp. v. Suzler Morat GMBH*,
139 F.3d 877 (Fed. Cir. 1998) ........................................................33

*OSRAM, Sylvania, Inc. v. American Induction Techs., Inc.*,
701 F.3d 698 (Fed. Cir. 2012) ........................................................36

*Plantronics, Inc. v. Aliph, Inc.*,
724 F.3d 1343 (Fed. Cir. 2013) ......................................38, 41, 42, 43

vi

## TABLE OF AUTHORITIES—cont'd

**Page**

*Ruiz v. A.B. Chance Co.*,
  234 F.3d 654 (Fed. Cir. 2000) ........................................................41

*SRAM Corp. v. ADII Engineering, Inc.*,
  465 F.3d 1351 (Fed. Cir. 2006) ..................................................23, 24

*Transocean,Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*,
  617 F.3d 1296 (Fed. Cir. 2010)  ..............................................41, 46,

*TriMed Inc. v. Stryker Corp.*,
  608 F.3d 1333 (Fed. Cir. 2010) ....................................23, 27, 32, 38

### Statutes

35 U.S.C. § 103 ..............................................................................24

35 U.S.C. § 141 (2011) ..................................................................18

28 U.S.C. § 1295 ..............................................................................4

28 U.S.C. § 1331 ..............................................................................4

28 U.S.C. § 1338 ..............................................................................4

## STATEMENT OF RELATED CASES

This appeal is closely related to three recently filed appeals pending in this Court—*Ivera Medical Corp. v. Covidien LP*, No. 15-1009; *Ivera Medical Corp. v. the Bimeco Group, Inc*., No. 15-1011; and *Ivera Medical Corp. v. New England Medical*, No. 15-1014—which are from judgments relying on the district court's rulings in the cases consolidated on this appeal and which concern the same patents at issue in this appeal.

## PRELIMINARY STATEMENT

In the cases below, which have been consolidated on appeal, the district court granted summary judgment, ruling that every asserted claim of the three patents-in-suit would have been obvious as a matter of law.  The inventions are medical devices: disinfecting caps that include vents designed to relieve pressure within the cap and to facilitate evaporation of the disinfectant inside the cap when it is screwed onto a valve during use.  In invalidating all the claims as obvious without trial, the court erred in concluding that "common sense" would have led a person of ordinary skill to add such vents to the prior art disinfecting caps.  To the contrary, the evidence showed that it was generally understood at the time of the invention that disinfecting caps should be fluid-tight.  A person of ordinary skill in the relevant art therefore would not have been motivated to add vents to disinfecting caps.  In addition, the court erred in disregarding evidence of objective indicia of non-obviousness such as the unexpected, stunning effectiveness of the patented vented disinfecting caps in reducing bloodstream infections and their resulting commercial success.  All of this evidence raised genuine issues concerning obviousness that preclude summary judgment, and this Court should vacate and remand.

The patents-in-suit are directed to caps that can be screwed on to external valves on catheter assemblies.  These assemblies contain catheters (small, flexible

tubes) that are inserted into a patient's veins to administer medication or to draw blood. Valves on the catheter assemblies allow healthcare workers to access the patient's bloodstream. If not properly disinfected, these valves can become pathways into the bloodstream for pathogens, which can cause serious and even fatal infections. Inventors Bob Rogers and Paul DiPerna developed a new disinfecting cap that defied the conventional wisdom of the time by including vents to prevent the exterior valves from improperly opening and to facilitate evaporation of the cleaning agent inside the cap. The inventors filed for patent protection and formed a company, plaintiff Ivera Medical Corporation, which has enjoyed great commercial success in large part because of the invention's unexpected success in reducing bloodstream infections.

The success of Ivera's vented disinfecting caps attracted competitors who brought similar disinfecting caps to market, and Ivera sued for infringement. On summary judgment, the district court held that Ivera's patents for vented disinfecting caps were invalid as obvious as a matter of law because the prior art contained both disinfecting caps and other types of caps that included vents for various purposes, and—according to the district court—common sense would have led skilled artisans to combine the two elements. This ruling, which is fraught with hindsight bias, should be vacated for two separate reasons.

*First*, the district court erred in relying upon its own, unarticulated "common sense" and failing to credit the evidence in the record that a person of ordinary skill in the art would not have been motivated to add a vent to the prior art disinfecting caps.  There were no disinfecting caps in the prior art with vents used to relieve pressure  within the caps and to facilitate evaporation of the cleaning agent inside the caps.  Although there were both vents and disinfecting caps in the prior art, none of the vents in the prior art performed the functions of the vents in the invention.  Ivera presented evidence that adding such vents to a disinfecting cap actually *defied* the conventional wisdom at the time that all connections relating to catheter assemblies should be fluid-tight, which would have led a person skilled in the art to be skeptical of the effectiveness of the invention's vented caps.   In disregarding this evidence, the district court failed to offer any clear explanation why "common sense" dictated otherwise at the time, as opposed to impermissible hindsight.

*Second*, the district court also erred in violating this Court's repeated instruction that courts should not decide whether a patent is obvious without considering objective indicia of non-obviousness, which provide a crucial check against hindsight bias.  That evidence here was compelling, showing that Ivera's vented disinfecting caps fulfilled a long-felt need; that the caps produced unexpected results in reducing bloodstream infections; and that, as a result of this

3

effectiveness, the caps enjoyed great commercial success.  These indicia are more than sufficient to raise a genuine issue concerning obviousness and preclude summary judgment.

The judgment should be vacated, and this case remanded for further proceedings.

## JURISDICTIONAL STATEMENT

In 2011, Ivera filed separate suits against Excelsior Medical Corporation, and Hospira, Inc., for infringing two patents, and in 2012 Ivera sued each of them again for infringing a third patent.  In 2012, Ivera also sued Catheter Connections for infringement of the same three patents.  Because these suits involved patent infringement, the district court had subject matter jurisdiction over them under 28 U.S.C. §§ 1331 & 1338.

On June 11, 2014, after granting summary judgment to Excelsior and Hospira, the district court entered final judgments in the suits involving these defendants.  A3-6.  On June 23, 2014, in light of these rulings, the district court also entered judgment in the cases involving Catheter Connections.  A1-2. Because Ivera filed timely notices of appeal in all six suits on July 3, 2014, A82, 87, 104, 112, 135, 141, this Court has appellate jurisdiction under 28 U.S.C. § 1295(a)(1) over the appeals, which were consolidated on July 25, 2014.

4

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in ruling that the claims of the patents-in-suit are obvious as a matter of law where there are genuine issues of material fact  whether a person of reasonable skill in the art would have been motivated to add vents to prior art disinfecting caps.

2.    Whether the district court erred in ruling that the claims of the patents-in-suit are obvious as a matter of law where it failed to properly consider the evidence of objective indicia of non-obviousness in the record, including evidence of fulfilling long-felt need, unexpected results, and commercial success.

## STATEMENT OF FACTS

### A.    The Ivera Patents-In-Suit

Ivera asserts infringement of three patents: U.S. Patent No. 7,780,794 (the '794 patent), A22-39; U.S. Patent No. 7,985,302 (the '302 patent), a continuation of the '794 patent, A40-54; and U.S. Patent No. 8,206,514 (the '514 patent), also a continuation of the '794 patent, A55-68.  All three patents describe a cap for catheter assemblies that cleans the exterior valves of those assemblies. Figures 6 and 7 on the next page are a cross-sectional and perspective view of one embodiment of the invention in which a threaded ring (item 106) inside the cap includes or creates a "small vent aperture or opening" in the cap wall "to allow evaporation of a cleaning agent in the cap."  A32 (col. 6, lines 35-43).

5



FIG. 6

FIG. 7

A25-26.  As indicated by Figure 14 below, in another embodiment, the cap has a rounded housing with "[h]oles in the housing" that "promote evaporation of the cleaning agent."  A33 (col. 8, lines 15-16).



FIG. 14

A29.

6

The patents claim a cap with a cleaning agent inside the cap as well as a second "aperture" or "opening" that inhibits the buildup of pressure against the exterior valve and allows the cleaning agent to evaporate. For example, Claim 13 of the '794 patent provides:

> 13. A cleaning device for a medical implement, the cleaning device comprising:
>
> a cap having a first opening to an inner cavity, an inner surface of the first opening including one or more threads adapted to receive a site of the medical implement;
>
> a cleaning material formed of a compressible material that is at least partially secured in the inner cavity the cleaning material containing a cleaning agent;
>
> a second opening in the cap to allow evaporation of the cleaning agent from the inner cavity and to inhibit a buildup of pressure in the cap when the cleaning material is compressed by the site of the medical implement and a removable covering that covers the first opening and the second opening to the inner cavity prior to coupling the threads of the cap with the site of the medical implement via the first opening.

A34 (col. 10, lines 1-17).

The two continuation patents similarly include limitations for a second "aperture" to allow venting. For example, claim 1 of the '302 patent provides for:

> 1. A cleaning device for a medical implement, the cleaning device comprising:
>
> a cap having an opening to an inner cavity, the opening for receiving a site of the medical implement;
>
> threading at least partially around an inside surface of the cap near a periphery of the opening to the inner cavity, the threading to engage corresponding threads on the site of the medical implement;

a compressible cleaning material in the inner cavity and containing a cleaning agent, the compressible cleaning material adapted to swab and clean the site with the cleaning agent;

at least one aperture to the inner cavity to allow venting from the inner cavity when the opening receives the site of the medical implement; and

a removable seal attached to the cap at the opening to cover the opening and to maintain the compressible cleaning material and cleaning agent within the inner cavity prior to receipt of the site of the medical implement.

A51-52 (col. 8, line 50 - col. 9, line 2). Dependent claims clarify that the aperture used for venting may be "transiently formed," that the venting involves the cleaning agent, and that the venting relieves pressure in the cap's inner cavity:

2. The cleaning device in accordance with claim 1, wherein the at least one aperture is transiently formed during receiving the site of the medical implement.

3. The cleaning device in accordance with claim 1, wherein the venting from the inner cavity includes venting of at least a portion of the cleaning agent.

4. The cleaning device in accordance with claim 1, wherein the venting from the inner cavity includes releasing pressure from the inner cavity.

A52 (col. 9, lines 3-11).

**B.     Background Of The Patent**

**1.     The Need To Disinfect Catheters**

When an intravenous line or other catheter is inserted into a patient, there is usually a valve on the outside through which medicine or other fluids can be administered and blood extracted. These valves should be disinfected to prevent

bacteria, viruses and other pathogens from entering into the patient's bloodstream. A30 (col. 1, lines 16-21). Such bloodstream infections cause from 90,000 to 250,000 estimated deaths a year in the United States and result in millions of other infections, which cost an estimated $4.5 billion a year to treat. A30 (col. 1, 27-32); A5341.

In the 1990s, hospitals began using needle-less valves in catheter assemblies. A5581-82. At first, sterile replacement caps were used to clean these valves. A5582. These caps, however, were expensive and inconvenient, and had problems with liquids pooling in them. A5582-83. Accordingly, "capless" valves that could be disinfected with alcohol pads were developed. A5583-84.

Though inexpensive, alcohol pads were frequently misused. A30 (col. 1, lines 56 - col. 2, line 4); A5341-42. Nurses often failed to take the time needed to swab valves properly. A30 (col. 1, lines 56-58); A5341-42. Moreover, despite widespread campaigns to promote effective swabbing, there was large variability in technique, which could not be effectively monitored. A30 (col. 1, 57-60); A5341-42.

### 2.    The Invention

The patents-in-suit describe caps for "capless" catheters with built-in disinfecting apparatuses that fit over catheter valves and can stay there for several days. Although there were earlier disinfecting caps, Bob Rogers and Paul DiPerna

invented a disinfecting cap with a new feature: vents to inhibit pressure buildup in the cap and to facilitate evaporation of the cleaning agent within the cap. The potential for the valve failing due to pressure within the cap and cleaning agent from the cap entering the bloodstream was a critical problems in the disinfecting caps available prior to Ivera's invention.

Like other disinfecting caps, this new cap includes within it an antiseptic pad, which is saturated with a cleaning agent such as alcohol. A5342-43. The cap is screwed onto the valve and the cleaning agent is pushed over the face of the valve and onto the threads, disinfecting the critical surfaces of the valve. When the cap is removed, the connection is disinfected and may be used to access the bloodstream without further swabbing or other disinfection procedures. Below is an image of an Ivera cap embodying the patented invention (on the right) with a "capless" valve (on the left).



A5364

Unlike prior art disinfecting caps, Ivera's caps have vents that allow alcohol in the caps to escape as the cap is attached to the valve and evaporate, both during

and after attachment.  A30 (col. 1, lines 53-55); A32 (col. 6, lines 7-10); A53; A5364-65, A5371-75.  This helps to ensure that cleaning agents do not enter into the catheter and contaminate the patient's bloodstream.  A5408-09.  Because fluids are effectively incompressible, the cleaning agent used in a disinfecting cap may generate significant pressures when the cap is screwed onto a catheter assembly and if these pressures are great enough, they can force open the valve to the catheter connected to the patient's bloodstream.  A5344-45.  The vents in the Ivera caps prevent such pressure buildup from forcing open catheter valves.  A5345-46; A5408-09.

### 3.    The PTO Proceedings

Rogers and Diperna assigned their invention to Ivera, which filed the application leading to the '794 patent that issued on August 24, 2010.  A22. During prosecution of this patent, the Patent and Trademark Office ("PTO") initially rejected the claims, finding them anticipated by a disinfecting cap invented by Ming Quan Hoang and another.  A5419.  In response, Ivera amended its claims, adding limitations directed to a second opening or aperture for venting that facilitates evaporation and inhibits pressure buildup.  A5412-18.  For example, what became claim 13 of the '794 patent was amended to add "a second opening in the cap to allow evaporation of the cleaning agent from the inner cavity and to

11

inhibit a buildup of pressure in the cap when the cleaning material is compressed by the site of the medical implement." A5415-16.

On June 21, 2010, the examiner allowed the claims of the '794 patent, finding that the venting element in Ivera's disinfecting cap distinguished it from prior art such as the Hoang cap because "the reviewed prior art does not disclose or render obvious a medical implement cleaning device comprising a cap having holes or openings for venting the device while in use." A5033; *see also* A5034 ("Hoang does not teach or suggest a second opening at the receipt site in addition to the opening to the inner cavity where the implement is received. He does not disclose or suggest vent holes, apertures, or additional openings to inhibit vacuum in the cap cleaning device.").

Ivera later filed continuation applications, which resulted in issuance of the '302 patent on July 26, 2011 and the '514 patent on June 26, 2012. A40; A55.

### 4.    Commercialization

Ivera released its first vented disinfecting caps commercializing the invention in 2009. A5339. Ivera expected its caps to disinfect catheter valves at least as well as a properly performed alcohol scrubs. A5352. In fact, Ivera's vented disinfecting caps proved dramatically better than conventional alcohol scrubs. A5352;A5623. Studies repeatedly showed dramatic decreases in bloodstream infections at hospitals using Ivera's vented disinfecting caps. A5346-

12

47, A5358-61; A5623.  One study showed an 85% reduction in infection rates and a 90% reduction in contaminated blood cultures.  A5347; A5623.

As a result of these clinical studies, leading medical institutions such as University of California San Francisco, University of California San Diego, the Cleveland Clinic, Brigham & Women's Hospital, and the Stanford University Medical Center adopted Ivera's vented disinfecting caps.  A5349-50. Consequently, even though Ivera was privately funded and had a limited sales and marketing budget, its sales grew exponentially, from 300,000 units in 2009 to 10 million units in 2010 and nearly 100 million units in 2012.  A5346-49; A5658.

## C.    The Prior Art

The district court's decision focused on three pieces of prior art: (1) the Hoang disinfecting cap, U.S. Pub. No. 2007/0112333 ("Hoang"), A5227-38; (2) an antiseptic coupler system, U.S. Patent No. 5,242,425 ("White"), A5199-207; and (3) a generic cap for hydraulic ports in medical devices, U.S. Patent No. 5,954,957 ("Chin-Loy"), A5273-83.

### 1.    The Hoang Sealed Disinfecting Cap



Hoang, which was cited during the prosecution of Ivera's patents, A22, discloses a disinfecting cap that includes an antiseptic pad and removable seal.  The primary embodiment of this invention is a dual

13

cap/cleaner with a cap on one end and a cleaner on the other, which is used after the cap is removed. A5229 (Fig. 2); A5235 (0017); A5236 (0032). Hoang also, however, disclosed an alternative embodiment with a combined cap and cleaner, which is portrayed on the prior page. A5234 (Fig. 10B). Hoang does not disclose an aperture to the inner cavity of the cap to facilitate evaporation of the cleaning agent or to release pressure created by the disinfecting agent. A5597.

### 2.    The White Coupling System

Defendants also relied on the White '425 patent. A5199-207. White is a catheter assembly "coupler" with two parts: a distal member for insertion into the patient's body and a trailing "proximal interconnecting member having a self-sealing septum." A5199 (Abstract), A5123 (col. 2, lines 45-50, lines 53-55). The assembly also contains an outer protective cap, which has antiseptic "for purposes of contacting the self-sealing septum and the interconnection to provide aseptic condition." A5123 (col. 2, lines 59-64). White describes that the cap is "preferably friction fit" but can be threaded. A5124 (col. 3, lines 34-36).

14



Fig. 7

Figure 7 represents an embodiment of White with the protective cap (item 78) over the interconnected distal member (item 70) and proximal member (item 82). A5206 (col. 7, lines 24-27, 29-32). Inside the outer protective cap is an antiseptic sponge (item 80). A5206 (col. 7, lines 27-29). Item 82 is the proximal member that contains a self-sealing septum (item 84). A5206 (col. 7, line 32). Item 70 is the distal member, which contains an "externally threaded shoulder" (item 74) that connects to the outer cap. A5206 (col. 7, lines 23-25). Thus, in use, the outer cap covers the exterior of the proximal member and the exterior surfaces of the distal member that are inside the cap.

### 3.    The Chin-Loy Multi-Purpose Cap

Chin-Loy discloses a generic or "multipurpose" cap used to cover a variety of ports on medical devices such as "hemodialyzers, hemofilters, hemodiafilters, and hemoconcentrators." A5280 (col. 3, lines 19-23); A5345; A5604-05. This cap prevents contamination from dust and physical contact during transportation and

15

storage of the device, but is removed once the device is used.  A5604-05.  The cap

is ***not*** a disinfecting cap.  A5604-05.  Indeed, the inventive aspect claimed by

Chin-Loy is that his "medical device cap [is] capable of fitting on ports of different

geometries" on different devices.  A5279 (col. 1, lines 52-53).

Below is Figure 1 of Chin-Loy, which is a side view of the cap:



A5274.

The Chin-Loy cap includes an air passageway (item 66).  A5281 (col. 5,

lines 1-4).  This passageway permits access to the interior of medical devices when

the cap is attached, which can be used to sterilize the devices during

manufacturing: "[w]hen the cap 10 is fully attached to a blood port of a medical

device, the channel 66 permits venting of the interior of the medical device through

the blood port during sterilization of the medical device."  A5281 (col. 5, lines 12-

16

15).  This passageway is designed to permit the injection of sterilizing gas (such as ethylene oxide) into the medical device while the device remained capped.  A5605.

### 4.    The Expectations Of Those Of Ordinary Skill At The Time of Invention

The parties agreed that a person of ordinary skill in the pertinent art would be a mechanical engineer with at least two to five years' of work experience in the medical device industry.  A15-16.  In addition, at the time of the invention, persons skilled in the art generally understood that, in a catheter assembly, "all fluid connections must be fluid-tight."  A5345.  Any leakage of fluids from the catheter was deemed unacceptable because it risked large losses of patient blood or even death, and therefore the conventional wisdom was that any connection in a patient fluid line should be fluid-tight.  A5244; A5293-94; A5345; A5585.

For example, according to Ming Quan Hoang, one of the co-inventors of the Hoang disinfecting cap, at the time of his invention in 2005, "it was the understanding and belief of persons of ordinary skill in the art, such as myself, that such a cap should seal over the access portion of the access valve and retain the cleaning solution contained in the cap."  A5652.  In fact, Hoang designed his cap to avoid any pathways or channels outside of the cap during placement or use because he believed that such pathways would allow cleaning solution to exit from the cap, which would reduce its effectiveness.  A5652-53.

17

### D.     The District Court's Summary Judgment Ruling

Defendants Excelsior, Hospira, and Catheter Connections all sell disinfecting caps that include an opening or aperture that vents disinfecting solution when attached to a catheter assembly.  Ivera filed separate actions against each of the Defendants, claiming infringement of the '794 patent and the '302 patent, and, after the '514 patent issued, infringement of that patent.  A8-10.

After Excelsior had filed request for both *ex parte* and *inter partes* reexaminations,[1] the district court ordered briefing concerning the validity of the patents-in-suit.  A125, A5665-67.  Following a claim construction order, A5425-46, which is not at issue on appeal, Catheter Connections filed a motion for summary judgment arguing there was no infringement under that claim construction, which was denied.  A5002-16.  Ivera subsequently moved for summary judgment against all three defendants, and Excelsior and Hospira cross-moved, arguing, among other things, that the patents-in-suit were rendered obvious by the combination of Hoang with either White or Chin-Loy.  A8-10; A19-20.  On April 30, 2014, the district

---

[1]     Although the PTO granted the request for *ex parte* reexamination, it ultimately held that the '794 and '302 patents were valid, finding that the prior art failed to show "venting at the time the cap is attached" as required by the patents' claims.  A5098; A5162.  In the *inter partes* reexamination, which was filed after issuance of the '514 patent, the PTO issued office actions invalidating the claims of the patents-in-suit, A5447-94; A5495-543; A5544-77, which Ivera is appealing. Because the *inter partes* reexamination was filed before the effective date of the American Invents Act, this appeal will follow pre-existing procedures, which allow for an appeal to the Patent Trial & Appeal Board and then to this Court.  *See*  35 U.S.C. § 141 (2011).

18

court denied Ivera's motion and granted the motions of Excelsior and Hospira. A21; *see also* A21 (granting summary judgment to Catheter Connections based on this ruling).

The district court described the invention as a cap with an opening to an inner cavity adapted to receive a medical implement as well as a compressible cleaning material loaded with a cleaning agent within the cavity. A16. The district court subsequently added that the invention requires "a second opening or aperture to allow venting." A18. It found that prior art discloses similar elements, A16, and that the only difference between the patents-in-suit and the Hoang disinfecting cap was that Hoang "does not explicitly disclose a second opening or aperture that allows the device to vent the cleaning agent," A19. The court then found that common sense would have led a person skilled in the art to add such an opening or aperture to Hoang. A19.

The district court asserted that a person of ordinary skill in the art "would not need the benefit of hindsight to realize that adding a vent would relieve possible pressure on the inside of the cap." A19. The court also found that a person of ordinary skill in the art would see the same benefit in a vent that the Chin-Loy patentees saw, namely, that having a channel to the exterior "permits venting of the interior of the medical device through the blood port during sterilization of the medical device." *Id.* (quoting A5281 (col. 5, lines 13-15)).

19

Finally, the district court found that venting to the exterior would provide the same benefit as White patentees saw, namely, "sterilizing a larger portion" of the medical device to which the cap is attached by permitting "'antiseptic to bathe the exterior surfaces'" of the device. A19 (quoting A5206 (col. 7, lines 29-32)). Then, "[c]onsidering the prior art, the scope of the patent claims, and the level of skill in the art," the district court concluded that the patents in issue were obvious as a matter of law. A20.

Only *after* reaching this conclusion did the district court turn to the objective indicia of non-obviousness in the record. The court recognized that there was evidence that Ivera's invention "filled a long-felt but unmet need, yielded unexpected results, and experienced commercial success." A20. Nevertheless, the district court held that these indicia of non-obviousness failed "to rebut the conclusion that the asserted claims of the patents-in-suit were obvious." *Id.* The court did not analyze the evidence of these indicia in the record. It simply stated, without explanation, that the evidence was "not enough to present a triable issue of material fact on obviousness as a matter of law." A20-21.

## SUMMARY OF ARGUMENT

The district court erred in ruling that there were no genuine issues of material fact and that Ivera's vented disinfecting caps were obvious as a matter of law.

1.    The district court erred in disregarding evidence that a person of ordinary skill in the art would not have been motivated to add vents to the Hoang disinfecting cap.  There were no vented disinfecting caps for catheter assemblies in the prior art, and although there were vents in devices other than disinfecting caps, those vents did not perform the same function as the vents in the invention, which is to inhibit pressure buildup and to facilitate evaporation of disinfectant.  As a consequence, the invention is not a predictable use of prior elements according to their established purposes.   In addition, Ivera presented evidence that the conventional wisdom at the time of the invention taught away from adding vents to a disinfecting cap for catheter assemblies because it was believed that all connections involving catheter assemblies should be fluid-tight.  This evidence of the differences between the functions served by the vents in the invention and the conventional wisdom at the time of the invention teaching away from the combining vents with disinfecting caps raises a genuine issue concerning obviousness that precludes summary judgment.

The district court erred in disregarding this evidence and relying instead on supposed "common sense."  In the face of the evidence in the record that a skilled artisan would not have been motivated to add vents to the prior art disinfecting caps.  The mere assertion of common sense is not sufficient to raise a genuine issue.  Indeed, to ensure that such assertions are not the product of hindsight bias, this

Court requires assertions of common sense to be supported by explicit reasoning. The district court failed to supply such reasoning. Accordingly, the district court erred in ruling as a matter of law that a skilled artisan would have been motivated to combine the prior art vents and disinfecting caps.

2.    The district court also erred in not properly considering the evidence of objective indicia of non-obviousness in the record. *First*, the court erred in considering the indicia of non-obviousness in the record only *after* concluding that the patents-in-suit are obvious. Because objective indicia of non-obviousness play a crucial role in safeguarding against hindsight bias, this Court repeatedly has instructed district courts to consider such indicia *before* determining whether an invention was obvious.

*Second*, the district court erred in failing to recognize that the evidence of objective indicia of non-obviousness in the record raises a genuine issue concerning obviousness. The evidence showed three indicia of non-obviousness: (1) the existence of a long-felt but unmet need that Ivera's vented disinfecting caps filled; (2) the unexpected—and, indeed, stunning—success of Ivera's vented caps in sharply decreasing bloodstream infections; and (3) the commercial success of Ivera's vented disinfecting caps. Especially in light of the evidence that a skilled artisan would not have been motivated to add vents to the prior art disinfecting

caps, this evidence is more than sufficient to raise a genuine issue concerning obviousness.

## STANDARD OF REVIEW

The district court's summary judgment ruling is reviewed *de novo*. *See, e.g.*, *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1339 (Fed. Cir. 2010). In reviewing a motion for summary judgment, the evidence presented is viewed in the light most favorable to the non-moving party. *See*, *e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In addition, because the evidence presented must be viewed through the prism of the standard of proof, a party moving for summary judgment based on invalidity "must submit such clear and convincing evidence of facts underlying invalidity that no reasonable jury could find otherwise." *SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir. 2006).

## ARGUMENT

A patent may not issue "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). As this Court has recognized, "[o]bviousness is a question of law based on underlying questions of fact," which include "(1) the scope and content of the prior art; (2) the level of ordinary skill in the prior art; (3) the differences between the claimed

23

invention and the prior art; and (4) objective evidence of non-obviousness." *Green Edge Enters., LLC v. Rubber Mulch Etc., LLC*, 620 F.3d 1287, 1298 (Fed. Cir. 2010). *See generally Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966).

A party moving for summary judgment based on obviousness bears a heavy burden. Because patents are presumed to be valid, a party challenging a patent based on obviousness must "demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1347 (Fed. Cir. 2014) (quotation omitted). This burden remains at all times with the party challenging validity and is further heightened if, in issuing the patent, the PTO considered the prior art asserted to render the patent invalid. *See*, *e.g.*, *Microsoft Corp. v. i4i Ltd.*, 131 S. Ct. 2238, 2250 (2011); *see also Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 642-43 (Fed. Cir. 2011) (holding that *inter partes* reexaminations have no preclusive effect until all appeal rights are exhausted). Moreover, to warrant summary judgment, a plaintiff must present such clear and convincing evidence of the facts concerning obviousness that "no reasonable jury could find otherwise." *SRAM Corp.*, 465 F.3d at 1357.

24

Defendants did not even begin to satisfy this burden. To the contrary, the evidence in the record raises a genuine issue whether, due to the conventional wisdom that connections involving catheter assemblies should be fluid-tight, a skilled artisan would have been motivated to add vents to the disinfecting caps in the prior art. In addition, the compelling objective indicia of non-obviousness in the record, which showed that the invention enjoyed great commercial success because of its stunning and unexpected effectiveness in reducing infections, raises a genuine issue as well. Accordingly, the district court erred in granting Defendants summary judgment.

## I.    THE DISTRICT COURT ERRED IN RULING THE PATENTS-IN-SUIT OBVIOUS AS A MATTER OF LAW DESPITE A GENUINE ISSUE WHETHER A SKILLED ARTISAN WOULD HAVE BEEN MOTIVATED TO ADD VENTS TO THE PRIOR ART DISINFECTING CAPS

The invention at issue is a vented disinfecting cap for catheter assemblies. The vents make the cap both more effective and safer by facilitating evaporation of the cleaning agent while preventing pressure buildup that might force open the exterior valve of the assembly. Although there were disinfecting caps prior to the invention, none of them had vents performing these functions. Moreover, evidence in the record showed that the combination of these two elements defied the conventional wisdom at the time that all connections involving a catheter assembly should be fluid-tight. Consequently, there is a genuine issue whether a person of

reasonable skill in the pertinent art would have been motivated to add vents to the prior art disinfecting caps

The district court erred in ruling the invention obvious on summary judgment in the face of this evidence that a skilled artisan would not have combined the pertinent elements of the prior art to make a vented disinfecting cap. Far from explaining how the invention at issue could be obvious as matter of law despite such evidence, the district court did not even mention the evidence. Instead, it asserted "common sense," but failed to offer the rational explanation needed to separate common sense from hindsight and, thus, failed to set forth any ground for finding obviousness.

### A.    The Prior Art Did Not Include A Disinfecting Cap With Vents To Facilitate Evaporation And To Inhibit Pressure Buildup

As the district court recognized, Ivera's invention is, at bottom, "a disinfecting cap with . . . a second opening or aperture to allow venting." A18. In addition to a cleaning material with a cleaning agent, this cap provides a vent, which acts "to allow evaporation of the cleaning agent" and "to inhibit a buildup of pressure in the cap when the cleaning material is compressed" as the cap is attached to a catheter assembly. A34 (col. 10, lines 7-14); *see also* A35 (col. 11, 1-4); A52 (col. 9, lines 6-11, 42-47); A52 (col. 10, lines 34-39); A67 (col. 10, lines 19-24, 62-67); A67 (col. 10, lines 51-53). Although the prior art included

disinfecting caps, it did not include caps with vents that function to facilitate evaporation and inhibit pressure buildup.

*Hoang*—The Hoang patent discloses a cap and cleaning device for patient fluid line access valves. A5227 (Abstract). An alternative embodiment of the device is a combined cap/cleaner with a pad infused with a cleaning agent included inside the cap. A5237 (0042-46). Unlike the invention, this cap has no vent to facilitate evaporation or to inhibit pressure buildup. Indeed, as the district court acknowledged, the Hoang cap contains no vents at all and, indeed, is sealed. A19.

*White*—The White patent discloses a catheter assembly consisting of two interconnecting members with an outer protective cap. A5203 (col. 2, lines 53-61). Much like the Hoang disinfecting cap, the White cap contains a sponge with antiseptic, which disinfects the interior of the assembly when attached. A5205-06 (col. 6, line 52-col. 7, line 11). This cap also contains no vent to inhibit pressure buildup and to facilitate evaporation.

The district court found that White discloses an embodiment that allows antiseptic solution to bathe the exterior of the distal member of the catheter assembly. A19. That is incorrect. Evidence presented by Ivera—which must be credited on summary judgment, *see, e.g.*, *TriMed*, 608 F.3d at 1341 (noting that the teaching of a reference is a question of fact that must be construed in the light most favorable to the nonmoving party)—showed that this embodiment does not contain

an opening or aperture to the outside environment.  Although White talks of permitting an antiseptic solution "to bathe the ***exterior*** surfaces of the distal member," the exterior surfaces bathed are the "***externally*** threaded shoulder" of the distal member *inside* the protective cap, not the surfaces outside the cap.  A5206 (col. 7, lines 24-41) (emphasis added).  The cap "maintains" the proximal member and the interconnection between the proximal member and the distal member of the catheter assembly "in aseptic conditions."  A5206 (col. 7, lines 33-35).  The cap could not maintain such conditions inside the cap if the cap had an opening to the exterior out of which the antiseptic solution flowed to bathe parts of the distal member outside the cap because the solution flowing outside of the cap would dry out the cap.  *See* A5594-95.  Nor would the outside of the distal member be maintained in an aseptic condition because the antiseptic solution would evaporate from such an exposed surface.  A5595.  Accordingly, a person of ordinary skill in the art would understand that a fluid-tight seal was necessary and that there was no opening or aperture to the exterior in the White cap.  *Id.*

*Chin-Loy*—The final reference cited by the district court was the Chin-Loy patent, which is not for a disinfecting cap or even a cap for catheter assemblies. Instead, Chin-Loy describes a multipurpose protective cap for medical devices used to purify and concentrate blood and other biological liquids.  A14; A5280 (col. 3, lines 19-23).  Unlike the invention, this cap is not designed to contain any

cleaning solution, and it has no vent from the inner cavity of the cap to the exterior that permits cleaning solution to evaporate or that relieves pressure inside the cap. Instead, the Chin-Loy cap is a protective cap that has a channel from the exterior through the cap to the inside if the medical device to which the cap is attached. A5279 (col. 2, lines 38-43).  This channel serves as an "air pathway" into the "interior of the medical device"—not the inner cavity of the cap—through which a sterilizing gas passes into the medical device during "sterilization of the medical device."  A5281 (col. 5, lines 12-15, 20-25); A5604-05.

Thus, while the prior art discloses a disinfecting cap and a multipurpose cap with a second opening or channel through the cap into the medical device to which the cap is attached, it does not disclose a disinfecting cap with a vent functioning to relieve pressure buildup and to facilitate evaporation, or even a vent serving those functions.

### B.    It Would Not Be Obvious To Combine The Pertinent Elements Of The Prior Art To Make The Invention Because The Invention Does Not Use Vents For Functions Established In The Prior Art

In moving for summary judgment, Excelsior argued that the invention at issue was obvious based on Hoang in view of Chin-Loy because adding the channel used for "venting" in Chin-Loy to the disinfecting cap in Hoang would have been advantageous and yielded predictable results.  *Ivera Medical Corp. v. Excelsior Medical Corp.*, No. 11-cv-1115, Dkt No. 75-1, at 19-20.  A combination

of prior art elements, however, only yields predictable results if those elements are used according to their established functions.  *See*, *e.g.*, *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 417 (2007) (in determining whether a device is obvious, "a court must ask whether the improvement is more than a predictable use of prior art elements according to their established functions").  Yet, the channel in Chin-Loy did not perform the same function as the vent in the patents-in-suit.

The vents in the patents-in-suit perform two functions.  By creating an opening from the interior of the disinfecting cap to the exterior, they "allow evaporation of the cleaning agent" and "inhibit a buildup of pressure in the cap," A34 (col. 10, lines 10-13).  The Chin-Loy channel performs an entirely different function.  As noted, the Chin-Loy protective cap contains a channel from the exterior into the interior of the medical device to which the cap is attached.  A5279 (col. 2, lines 38-43).  The purpose of this channel is not to relieve pressure in the cap or to allow evaporation of the cleaning agent used in the cap.  It is instead to provide a passageway through which gas may pass into the interior of the medical device and sterilize the device.  A5281 (col. 5, lines 12-15, 20-25); A5604-05.  Thus, the vent in the patents-in-suit does not perform the function performed by the channel in Chin-Loy.

The district court found that a person of ordinary skill in the art would have seen the "benefit that Chin-Loy patentees saw:  that a channel formed when the cap

30

is fully attached 'permits venting of the interior of the medical device through the blood port during sterilization of the medical device.'" A19 (quoting A5281 (col. 5, lines 1-20)). But the cap described in patents-in-suit does not permit venting into the interior of the medical device to which the cap is attached. Indeed, that vent does not even extend into the catheter assemblies to which the caps are attached. Indeed, one of the purposes of the vent in the invention is to inhibit buildup of pressure inside the cap that might force the valve open and expose the interior of the assembly to the cleaning agent within the caps. *See* A5345-46; A5408-09.

Although none of the Defendants argued that the patents-in-suit were obvious because of Hoang in light of White,[2] the district court ruled that this combination was obvious because adding a vent to the Hoang disinfecting cap would "allow the cleaning agent to vent onto the exterior of the medical implement, sterilizing a larger portion of it." A19. As shown above, however, the White cap vents to the exterior surfaces of the members of the catheter assembly *inside* the cap, not to surfaces outside the cap. *See supra* pp. 27-28. In addition, the function of the vent in the invention is not to bathe exterior surfaces with a cleaning agent and disinfect the outside surfaces of a catheter assembly: as shown above, it is to

---

[2]    Excelsior argued that the patents were obvious because of White in light of Hoang, *Ivera Medical Corp. v. Excelsior Medical Corp.*, No. 11-cv-1115, Dkt. No. 75-1, at 16-19, but the district court did not adopt this argument.

31

inhibit pressure buildup and to facilitate evaporation of the cleaning agent within the cap. Here again, the invention does not use any vent in the prior art according to its established function.

The different functions served by the channel in Chin-Loy and the vent in the invention raises a genuine issue whether a skilled artisan would have been motivated to combine such a channel with the prior art disinfecting cap in Hoang. In *TriMed*, 608 F.3d 1333, the district court had granted summary judgment on the ground that the patented invention—a device for setting bone fractures using screws, pins, and a plate with holes for screws and pins—was obvious because the prior art contained screws, pins, and plates, and it was common sense to combine them. *Id.* at 1336-39. This Court disagreed, ruling that there was a genuine issue whether "the claimed invention achieves predictable results and uses prior art elements according to their established functions" because the parties submitted conflicting evidence on that issue. *Id.* at 1341-42.

This case is materially indistinguishable. Here, as in *TriMed*, there is expert testimony that the invention does not use the element at issue (here, vents) according to its established function, thereby raising a genuine issue concerning whether a skilled artisan would have been motivated to use the vents for the different function performed in the invention. Indeed, defendants failed to present any contrary expert testimony. Moreover, far from explaining how any element of

32

Chin-Loy or White performs the function of the vents in the patent-in-suit (inhibiting pressure buildup and facilitating evaporation), the district court simply ascribed the functions performed to the claimed invention.

### C. Adding Vents To The Prior Art Disinfecting Cap Defied The Conventional Wisdom That Catheter Assemblies Should Be Fluid-Tight

Even if the prior art had disclosed vents performing the same function as the vents in the patents-in-suit, the patents-in-suit still would not be obvious as a matter of law. Generally, a party asserting obviousness must demonstrate, by clear and convincing evidence, that "a skilled artisan would have been motivated to combine the teaching of the prior art references to achieve the claimed invention." *InTouch Techs.*, 751 F.3d at 1347 (quotation omitted). To be motivated to combine prior art references, however, a skilled artisan must "perceiv[e] a reasonable expectation of success in making the invention." *Amgen, Inc. v. F. Hoffman-La Roche, Ltd*., 580 F.3d 1340, 1362 (Fed. Cir. 2009). Accordingly, evidence of skepticism towards a combination or specific concerns about an element teaching away from a combination is "relevant and persuasive evidence of nonobviousness." *Monarch Knitting Mach. Corp. v. Suzler Morat GMBH*, 139 F.3d 877, 885 (Fed. Cir. 1998); *see also KSR*, 550 U.S. at 416 ("[W]hen the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious."). Here,

Ivera presented evidence that a skilled artisan would not have expected a vented disinfecting cap for catheter assemblies to succeed because the conventional wisdom at the time of the inventions in the patents-in-suit was that all connections relating to catheter assemblies should be fluid-tight and, thus, taught away from the combination in the patents-in-suit.

For example, Ivera presented testimony from an expert on medical device engineering, Karl Leinsing, that at the time of the invention the conventional wisdom was that medical devices used in a hospital environment should be fluid-tight. "[I]n the field of medical devices," Leinsing observed, "fluid-line connections of all types are assumed to be fluid-tight unless otherwise designated." A5585. This assumption "reflects the basic understanding that in a hospital environment, it is not good practice to have leaky connections." A5585 ("Whether the fluid in question is a bodily fluid, a medication, a disinfecting agent, a gas such as an oxygen mixture, or even just saline, the presumption is that every connection is fluid-tight to avoid leakage of any such fluid into the hospital environment.") Accordingly, "a person of ordinary skill in the art at the time of the invention would understand any fluid line connection to be a fluid-tight connection unless otherwise indicated." A5585-86.

This conclusion is supported by a declaration from Ming Quan Hoang, one of the co-inventors of the Hoang cap. Hoang agreed that "it was the understanding

34

and belief of persons of ordinary skill in the art, such as myself, that such a cap should seal over the access portion of the access valve and retain the cleaning solution contained in the cap." A5652. Thus, Hoang designed his cap to maintain the inside of the cap in an antiseptic or aseptic condition "by sealing and retaining the cleaning solution within the housing while the cap is placed over the access portion." *Id*. "Using any kind of channel or pathway from the interior of the housing to the external environment," Hoang explained, "would frustrate the design of such a cap." A5654. Accordingly, Hoang concluded, "[a] person of ordinary skill in the art would not look to Chin-Loy, or any other reference, for that matter, that discloses a pathway or channel from an interior to an exterior of a cap. . . ." *Id.*

Ivera also presented similar declarations from other inventors in connection with the briefing on invalidity requested by the district court. *See supra* p. 18. For example, according to Alan Buchman, the inventor of another disinfecting cap for catheter assemblies, "[i]t was commonly understood at the time that effective disinfection of the surface of the injection port required that it be continuously bathed in the antimicrobial fluid," and therefore he sought to create a cap "that would form a fluid-tight seal." A5293-94. Bobby Rogers, one of the co-inventors of the patents-in-suit, similarly stated that "[a]t the time it was commonly understood that all fluid connections must be fluid tight." A5345. "In a hospital

35

environment," Rogers observed, "it was assumed that any patient fluid line connection must be fluid-tight because leakage of fluids into the patient environment was unacceptable and in some cases could result in large losses of blood and potentially patient exsanguination or death." A5345; *see also id.* ("The idea of a 'loose' connection or otherwise non fluid-tight connection on a patient was not even considered by anyone of ordinary skill in the art, much less assumed.").

This evidence was more than sufficient to raise a genuine issue concerning obviousness and preclude summary judgment. It shows that, at the time of the invention, a person of ordinary skill in the pertinent art would have been skeptical whether a disinfecting cap that was not fluid-tight would be effective in reducing infections or, even if it were, would be accepted by the medical community. As a consequence, a person of ordinary skill in the art would not have been motivated to add a vent to the prior art disinfecting caps. This evidence that the patents-in-suit defied conventional wisdom is more than sufficient to raise a genuine issue concerning obviousness, especially as on summary judgment the evidence must be viewed in the light most favorable to the nonmoving party and all reasonable inferences drawn in favor of that party, and as obviousness must be proven by clear and convincing evidence. *See, e.g.*, *Microsoft*, 131 S. Ct. at 2242; *OSRAM Sylvania, Inc. v. Am. Induction Techs., Inc.*, 701 F.3d 698, 706 (Fed. Cir. 2012).

36

### D.    The District Court Erred In Ruling the Patents In Issue Obvious Based on Unexplained Assertions Of "Common Sense"

In ruling that the invention was obvious as a matter of law, the district court did not consider the evidence of the understanding of persons with ordinary skill in pertinent art at the time of the invention. Instead, it relied on "common sense." A18-19. Common sense, however, cannot override evidence that the invention does not use the elements of the prior art according to their established functions, or that a skilled artisan would not have been motivated to combine the elements of the prior art because of conventional wisdom teaching away from the combination. In the face of such evidence, common sense at best might raise a genuine issue for the fact finder to consider and thus cannot support the entry of summary judgment in this case.

Indeed, even apart from the evidence of conventional wisdom teaching away from the invention, the district court's invocation of "common sense" is insufficient. Although the Supreme Court has recognized that, in some circumstances, common sense may lead a skilled artisan to combine elements in the prior art, *see KSR*, 550 U.S. at 420, the Court also has recognized the danger that hindsight bias may infect analysis of obviousness, *see Graham*, 383 U.S. at 36. "[K]nowing that the inventor succeeded in making the patented invention," there is a natural but erroneous tendency of the fact finder to "develop a hunch that the claimed invention was obvious, and then construct a selective version of the facts

37

that confirms that hunch." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Lit.*, 676 F.3d 1063, 1079  (Fed. Cir. 2012) (discussing *Graham*).  This danger is heightened with simple technology because, "once the problem and solution appear together in the patent disclosure, the advance seems self-evident." *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012).

Accordingly, this Court has held that "[m]erely saying that an invention is a logical, commonsense solution to a known problem does not make it so." *TriMed*, 608 F.3d at 1343; *see also Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1354 (Fed. Cir. 2013) ("[T]he mere recitation of the words 'common sense' without any support adds nothing to the obviousness equation.").  Instead, when a court finds obviousness based on "common sense," its findings "must contain explicit and clear reasoning providing some rational underpinning why common sense compels a finding of obviousness." *Plantronics*, 724 F.3d at 1354 (quotation and citation omitted); *see also In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) ("[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.").

The district court failed to supply such reasoning.  The court noted that a person of ordinary skill would realize that adding a vent would relieve possible pressure on that inside of the cap.  A19; *see also id.* (asserting that a skilled artisan

would see that the vent would permit venting of the interior of a medical device and bathing of the exterior surfaces of the medical device). The district court, however, failed to offer any reason why a person of ordinary skill in the art would have used a vent to relieve pressure. Moreover, the record showed that there are other ways to manage pressure, such as including excess volume in the cap or using elastic materials, A5246, and, as shown above, conventional wisdom taught away from using connections that are not fluid-tight. *See supra* pp. 34-36. Thus, the district court's finding that "common sense" would have led a person of ordinary skill in the art to add a vent to the prior art disinfecting cap lacks any rational underpinning.

In short, the district court erred in ruling that, as a matter of law, it would have been obvious to add a vent to the prior art Hoang disinfecting cap to inhibit pressure buildup and to facilitate evaporation, in the absence of any evidence why a skilled artisan would have been motivated to do so, and in the face of evidence that it would have defied conventional wisdom to do so.

## II. THE DISTRICT COURT ALSO ERRED IN GRANTING SUMMARY JUDGMENT OF OBVIOUSNESS BECAUSE IT FAILED TO PROPERLY CONSIDER OR CREDIT OBJECTIVE INDICIA OF NON-OBVIOUSNESS

As an independent ground for reversal, the district court also erred in failing to give proper consideration to the evidence of objective indicia of non-obviousness presented by Ivera. Analysis of objective evidence of non-

obviousness is critical to the obviousness inquiry because such evidence operates as "a check against hindsight bias." *In re Cyclobenzaprine*, 676 F.3d at 1079; *see also Graham*, 383 U.S. at 36 (noting that objective considerations "serve to guard against slipping into use of hindsight, and to resist the temptation to read into the prior art the teachings of the invention in issue") (internal citations removed). Indeed, "objective indicia may often be the most probative and cogent evidence of nonobviousness in the record." *Mintz*, 679 F.3d at 1378 (quotation omitted); *see also id.* ("Such evidence may often establish that an invention appearing to have been obvious in light of the prior art was not.") (quotation omitted). Accordingly, this Court has instructed district courts that objective indicia of non-obviousness must be considered in the course of determining obviousness, not after a determination has been made. *In re Cyclobenzaprine*, 676 F.3d at 1075-79. The district court failed to follow this procedure, and then compounded its error by failing to recognize the compelling nature of the objective indicia of non-obviousness in the record, which plainly raises a genuine issue concerning obviousness.

### A.    The District Court Erred In Determining That The Patents-In-Suit Were Obvious Before Considering Objective Indicia Of Non-Obviousness

Far from considering objective indicia of non-obviousness in determining whether the patents-in-suit are obvious, the district court concluded that the

patents-in-suit were obvious before considering the objective indicia and then considered whether those indicia rebutted the conclusion of non-obviousness. As this Court recognized in *In re Cyclobenzaprine*, this approach is improper. 676 F.3d at 1079.

This Court "has consistently pronounced that all evidence pertaining to the objective indicia of nonobviousness must be considered before reaching an obviousness conclusion." *Plantronics*, 724 F.3d at 1355; *see also Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1305 (Fed. Cir. 2010) ("Our case law is clear that this type of evidence [objective considerations of non-obviousness] must be considered in evaluating the obviousness of a claimed invention.") (quotation omitted); *In re Cyclobenzaprine*, 676 F.3d at 1079 ("[A] fact finder in district court litigation may not defer examination of the objective considerations until after the fact finder makes an obviousness finding."); *Ruiz v. A.B. Chance Co*., 234 F.3d 654, 667 (Fed. Cir. 2000) ("Our precedents clearly hold that secondary considerations, when present, must be considered in determining obviousness."); *Alco Standard Corp. v. Tennessee Valley Authority*¸ 808 F.2d 1490, 1500 (Fed. Cir. 1986) (evidence of objective indicia of non-obviousness "is to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art").

The district court ignored this clear directive. "Considering the prior art, the scope of the patent claims, and the level of skill in the art," the district court concluded that there was "no triable issue of material fact" and that the patents-in-suit were obvious as a matter of law. A20. *After* reaching that conclusion, the court turned to the evidence of objective indicia of non-obviousness, which it termed "secondary considerations." *Id*. It recognized that Ivera had presented evidence that the patents-in-suit "filled a long-felt but unmet need, yielded unexpected results, and experienced commercial success." *Id*. Nevertheless, it ruled (without explanation) that this evidence failed "to *rebut* the conclusion that the asserted claims of the patent-in-suit are obvious." A20-21 (emphasis added).

The district court's failure to consider objective indicia of non-obviousness before concluding that the patents-in-suit were obvious is reversible error. For example, in *Plantronics, Inc. v. Aliph, Inc*., 724 F.3d 1343, the district court had addressed the plaintiff's objective evidence of non-obviousness only after concluding that the invention in question was obvious, *id*. at 1355, and when it did considered that evidence, had stated only that it did not find the evidence persuasive, *id*. at 1356. This Court vacated the grant of summary judgment. It held that "[t]o the extent the district court conducted a post hoc analysis of objective considerations, it was improper," and that the court's conclusory

rejection of those considerations was inadequate because it "fail[ed] to provide any meaningful analysis for this court's review." *Id*. at 1355-56.

This case is materially indistinguishable. Here, as in *Plantronics*, the district court engaged in an improper "post hoc analysis of objective considerations" by ruling the patents-in-suit obvious before considering objective indicia of non-obviousness. A20. In addition, far from offering any meaningful analysis of those considerations, the court stated that the evidence of these considerations was "not enough to present a triable issue of material fact on obviousness." A20-21. Indeed, the district court's error in this case was more egregious than the error in *Plantronics* because the district court shifted the burden of proof based on its conclusion that the patents-in-suit are obvious, requiring Ivera to "rebut" that conclusion. A20. As *In re Cyclobenzaprine* recognized, although some decisions have spoken in terms of *prima facie* cases that must be rebutted by the patentee, the burden of proof never shifts, and a party asserting obviousness always bear the heavy burden of proving obviousness by clear and convincing evidence. 676 F.3d at 1076-78.

**B.    The District Court Also Erred In Ruling That The Compelling Objective Indicia Of Non-Obviousness In The Record Failed To Raise A Genuine Issue Concerning Obviousness**

The district court also erred in evaluating the evidence of objective indicia of non-obviousness in the record. Ivera presented evidence that the patents-in-suit

43

fulfilled a long-felt but unmet need, produced unexpected results, and enjoyed commercial success. This extensive and compelling evidence of non-obviousness is more than sufficient to raise a genuine issue of fact.

*First*, there was evidence that Ivera's vented disinfecting caps satisfied a "long-felt industry need." From the early 1990s when hospitals began using needle-less catheters until the introduction of the Ivera cap in the late 1990s, hospitals encountered grave difficulties in disinfecting these catheters and preventing bloodstream infections. A5341-42; A5622-23. Campaigns to improve alcohol swabbing were tried, as were a number of different caps and other devices, but none proved commercially successful given the lack of clinical evidence establishing their effectiveness as well as their high cost. A5342-44; A5622-23. Ivera's cap, however, met this need, and succeeded commercially precisely because of the clinical evidence establishing its effectiveness. A5346-54; A5623. As this Court has recognized, evidence that a demand existed for the patented invention and that unsuccessful attempts were made to satisfy that need is "particularly probative of obviousness." *In re Cyclobenzaprpine*, 676 F.3d at 1082.

*Second*, there was evidence that Ivera's vented disinfecting caps proved unexpectedly effective, another objective indicium of non-obviousness. *See, e.g.*, *Mintz*, 679 F.3d at 1379 (recognizing that "unexpected results" is an indicium of non-obviousness). When Rogers and DiPerna developed these caps, their goal was

44

that the caps would perform at least as well as a properly performed alcohol scrub by a nurse and thus reduce the incidence of bloodstream infections. A5352; A5623. In fact, the Ivera cap performed dramatically better. For example, one study in an oncology unit with seriously ill patients highly prone to infections showed that use of Ivera caps reduced the infection rate by approximately 85% and reduced contaminated blood cultures by approximately 90%. A5347; A5623. Other studies, including one published in a peer reviewed journal, likewise showed dramatic reductions in infection and contamination rates. A5352-54.

*Third*, there was evidence that, as a result of these studies establishing their effectiveness, Ivera's vented disinfecting caps have achieved great commercial success, yet another objective indicium of non-obviousness. *See, e.g.*, *Graham*, 383 U.S. at 17 (noting that "commercial success" is an indicium of non-obviousness). A privately funded company, Ivera had a limited sales and marketing budget, and it had to persuade hospitals to change their disinfection protocols as well. A5346. Nevertheless, as word of the effectiveness of Ivera's caps spread, they have been adopted by leading medical institutions such as University of California San Francisco, University of California San Diego, the Cleveland Clinic, Brigham & Women's Hospital, and the Stanford University Medical Center. A5349-50. Moreover, Ivera has enjoyed exponential growth in sales from 300,000 units in 2009 to 10 million units in 2010 and nearly 100 million

45

units in 2012.  A5347-49; A5658.  Thus, Ivera has enjoyed great commercial success precisely because of the innovative nature of the patented invention, and the success of the company and its vented disinfecting caps is a testament to the innovativeness and nonpredictability of the invention. *See, e.g*., *Cont'l Can Co. USA, Inc. v. Monsanto Co*., 948 F.2d 1264, 1273 (Fed. Cir. 1991) ("[W]hen differences that may appear technologically minor nonetheless have a practical impact, particularly in a crowded field, the decision-maker must consider the obviousness of the new structure in this light.").

These objective indicia of non-obviousness provide compelling evidence of non-obviousness and thus raise a genuine issue concerning obviousness.  For example, in *Transocean*, 617 F.3d 1296, the defendant claimed that a patent for an oil derrick with both a main and an auxiliary advancing station was obvious because prior art disclosed a derrick with two advancing stations, and while this art lacked one element in the claimed invention, that element was present in other prior art.  *Id*. at 1300-01, 1303.  This Court ruled that the prior art created a *prima facie* case of obviousness because the prior art itself gave a reason to combine the elements in the patented invention.  *Id*. at 1303-04.  Nevertheless, this Court held that the patentee had raised a genuine issue by presenting evidence of commercial success, industry praise, and other objective indicia of non-obviousness.  *See id*. at 1304-05.  Similarly, here, the invention was an addition of an element to the prior

art, but there was evidence of commercial success.  Indeed, in this case, the objective indicia of non-obviousness are more compelling than in *Transocean* because the unexpected effectiveness of the invention—another indicium of non-obviousness—led to the commercial success.  Especially in combination with the evidence that the invention defied conventional wisdom, this evidence raises a genuine issue of material fact.  The district court erred in failing to recognize this issue and in granting summary judgment based on its hindsight-influenced view of common sense.

## CONCLUSION

The judgment below should be vacated, and this case remanded for further proceedings.

Dated: October 24, 2014

Respectfully submitted,

By: /s/ Daniel H. Bromberg
    Daniel H. Bromberg
    Brian C. Cannon
    QUINN EMANUEL URQUHART
      & SULLIVAN, LLP
    555 Twin Dolphin Drive, 5th Floor
    Telephone: (650) 801-5000
    Facsimile: (650) 801-5100
    danbromberg@quinnemanuel.com

    Kathleen M. Sullivan
    QUINN EMANUEL URQUHART
      & SULLIVAN, LLP
    51 Madison Avenue, 22nd Floor
    New York, NY 10010
    Telephone: (212) 849-7000
    Facsimile: (212) 849-7100
    kathleensullivan@quinnemanuel.com

    *Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing Brief for Plaintiff-Appellant complies with the type-volume limitations of Fed. R. app. P. 32(a)(7)(b). The brief was printed using 14-point Times New Roman font.   The word-processing system used to prepare the document, excluding the Table of Contents, Table of Authorities, and Certificate of Interest, calculates that it contains 10,672 words.

/s/ Daniel H. Bromberg
Daniel H. Bromberg

**ADDENDUM**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

IVERA MEDICAL CORPORATION,

          Plaintiff-Counterdefendant,

vs.

CATHETER CONNECTIONS, INC.,

          Defendant.

Case Nos. 12-cv-954-H (RBB)
12-cv-1587-H (RBB)

**JUDGMENT FOR
DEFENDANT CATHETER
CONNECTIONS, INC.**

On April 29, 2014, the Court granted summary judgment of invalidity based on obviousness against Plaintiff Ivera and for Defendant Catheter Connections as to all asserted patent claims. (Doc. No. 98.) On June 23, 2014, the Court issued an order pursuant to Federal Rule of Civil Procedure 41(a) on the parties' stipulated dismissal of Catheter Connections's nonliability counterclaim. (Doc. No. 103.) Accordingly, it is hereby ORDERED, ADJUDGED, AND DECREED, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, that judgment be and is entered in favor of Defendant Catheter Connections and against Plaintiff Ivera.

**IT IS SO ORDERED.**

DATED: June 23, 2014

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

12cv954; 12cv1587

A00001

1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**
9          **SOUTHERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| 11   IVERA MEDICAL CORPORATION, | Case Nos.  12-cv-954-H (RBB) |
| 12                    Plaintiff-Counterdefendant, | 12-cv-1587-H (RBB) |
| 13       vs. | **JUDGMENT FOR DEFENDANT CATHETER CONNECTIONS, INC.** |
| 14   CATHETER CONNECTIONS, INC., | |
| 15                    Defendant. | |

16          On April 29, 2014, the Court granted summary judgment of invalidity based on

17   obviousness against Plaintiff Ivera and for Defendant Catheter Connections as to all

18   asserted patent claims.  (Doc. No. 98.)  On June 23, 2014, the Court issued an order

19   pursuant to Federal Rule of Civil Procedure 41(a) on the parties' stipulated dismissal

20   of Catheter Connections's nonliability counterclaim.  (Doc. No. 103.)  Accordingly, it

21   is hereby ORDERED, ADJUDGED, AND DECREED, pursuant to Rule 54(b) of the

22   Federal Rules of Civil Procedure, that judgment be and is entered in favor of Defendant

23   Catheter Connections and against Plaintiff Ivera.

24          **IT IS SO ORDERED.**

25   DATED: June 23, 2014

26   _____

27   MARILYN L. HUFF, District Judge

28   UNITED STATES DISTRICT COURT

- 1 -                                                        12cv954; 12cv1587

**A00002**

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IVERA MEDICAL CORPORATION, | Case Nos.: |
| Plaintiff-Counterdefendant, | 11-cv-1115-H-RBB<br>12-cv-1581-H-RBB |
| vs. | |
| EXCELSIOR MEDICAL CORPORATION, | **JUDGMENT FOR DEFENDANT EXCELSIOR MEDICAL CORPORATION** |
| Defendant-Counterplaintiff. | |

On April 29, 2014, the Court granted summary judgment of invalidity based on obviousness against Plaintiff Ivera and for Defendant Excelsior as to all asserted patent claims. (Doc. No. 119.) On June 11, 2014, the Court issued an order pursuant to Federal Rule of Civil Procedure 41(a) on the parties' stipulated dismissal of Excelsior's unenforceability and non-infringement counterclaims. (Doc. No. 130.) Accordingly, it is hereby ORDERED, ADJUDGED, AND DECREED, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, that judgment be and is entered in favor of Defendant Excelsior and against Plaintiff Ivera.

**IT IS SO ORDERED.**

DATED: June 11, 2014

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

11cv1115; 12cv1581

**A00003**

1

2

3

4

5

6

7

8      **UNITED STATES DISTRICT COURT**

9      **SOUTHERN DISTRICT OF CALIFORNIA**

10

11     IVERA MEDICAL CORPORATION,          Case Nos.:
                                            11-cv-1115-H-RBB
12              Plaintiff-Counterdefendant,  12-cv-1581-H-RBB
           vs.
13                                          **JUDGMENT FOR**
       EXCELSIOR MEDICAL              **DEFENDANT EXCELSIOR**
14     CORPORATION,                   **MEDICAL CORPORATION**

15              Defendant-Counterplaintiff.

16          On April 29, 2014, the Court granted summary judgment of invalidity based on

17
       obviousness against Plaintiff Ivera and for Defendant Excelsior as to all asserted patent
18
       claims.  (Doc. No. 119.)  On June 11, 2014, the Court issued an order pursuant to
19
       Federal Rule of Civil Procedure 41(a) on the parties' stipulated dismissal of Excelsior's
20
       unenforceability and non-infringement counterclaims. (Doc. No. 130.)  Accordingly,
21
       it is hereby ORDERED, ADJUDGED, AND DECREED, pursuant to Rule 54(b) of the
22
       Federal Rules of Civil Procedure, that judgment be and is entered in favor of Defendant
23
       Excelsior and against Plaintiff Ivera.
24
            **IT IS SO ORDERED.**
25
       DATED: June 11, 2014
26
27                                          _____
                                            MARILYN L. HUFF, District Judge
28                                          UNITED STATES DISTRICT COURT

- 1 -                                       11cv1115; 12cv1581

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IVERA MEDICAL CORPORATION,<br><br>     Plaintiff-Counterdefendant,<br>    vs.<br><br>HOSPIRA, INC.,<br><br>     Defendant-Counterplaintiff. | Case Nos.:<br>11-cv-1246-H-RBB<br>12-cv-1582-H-RBB<br><br>**JUDGMENT FOR<br>DEFENDANT HOSPIRA, INC.** |

On June 11, 2014, the Court granted the parties' joint motion for final judgment. (Doc. No. 175.) Accordingly, it is hereby ORDERED, ADJUDGED, AND DECREED, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, that judgment be and is entered in favor of Defendant Hospira and against Plaintiff Ivera.

**IT IS SO ORDERED.**

DATED: June 11, 2014

_____
MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

11cv1246; 12cv1582

**A00005**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IVERA MEDICAL CORPORATION,<br><br>    Plaintiff-Counterdefendant,<br>vs.<br><br>HOSPIRA, INC.,<br><br>    Defendant-Counterplaintiff. | Case Nos.:<br>11-cv-1246-H-RBB<br>12-cv-1582-H-RBB<br><br>**JUDGMENT FOR<br>DEFENDANT HOSPIRA, INC.** |

On June 11, 2014, the Court granted the parties' joint motion for final judgment. (Doc. No. 175.) Accordingly, it is hereby ORDERED, ADJUDGED, AND DECREED, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, that judgment be and is entered in favor of Defendant Hospira and against Plaintiff Ivera.

**IT IS SO ORDERED.**

DATED: June 11, 2014

_____
MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

**A00006**

1

2

3

4

5

6

7

8     **UNITED STATES DISTRICT COURT**

9     **SOUTHERN DISTRICT OF CALIFORNIA**

10

11    IVERA MEDICAL CORPORATION,          Case Nos.:
                                          11-cv-1115-H-RBB
12                          Plaintiff,    11-cv-1246-H-RBB
                                          12-cv-954-H-RBB
13         vs.                            12-cv-1581-H-RBB
                                          12-cv-1582-H-RBB
14                                        12-cv-1587-H-RBB

15                                        **ORDER:**

16    EXCELSIOR MEDICAL                   **1) GRANTING DEFENDANTS'**
      CORPORATION,                        **MOTIONS FOR SUMMARY**
17                                        **JUDGMENT OF PATENT**
                                          **INVALIDITY;**
18                          Defendant.    [1115] Doc. Nos. 73 & 87
                                          [1246] Doc. No. 136
19
      IVERA MEDICAL CORPORATION,          **and**
20
                            Plaintiff,    **2) DENYING PLAINTIFF'S**
21                                        **MOTIONS FOR SUMMARY**
           vs.                            **JUDGMENT;**
22                                        [1115] Doc. No. 71
                                          [1246] Doc. No. 133
23    HOSPIRA, INC.,                      [954] Doc. No. 82

24

25                          Defendant.

26    IVERA MEDICAL CORPORATION,

27
                            Plaintiff,
28

**A00007**

1

2     vs.

      CATHETER CONNECTIONS, INC.,

3

                                    Defendant.

4

5          These actions involve six consolidated patent infringement actions brought by

6     Plaintiff against Defendants for infringing U.S. Patent Nos. 7,780,794 ("the '794

7     patent"), 7,985,302 ("the '302 patent"), and 8,206,514 ("the '514 patent") (collectively,

8     the "patents-in-suit"). The '302 and '514 patents are continuations of the '794 patent,

9     and contain the same specification. The Court consolidated the Catheter Connections

10    actions, Case Nos. 12-cv-954-H and 12-cv-1587-H, on February 8, 2013. ([954][1] Doc.

11    No. 32.) The Court consolidated the Excelsior actions, Case Nos. 11-cv-1115-H and

12    12-cv-1581-H, on February 26, 2013. ([1115][2] Doc. No. 37.) The Court consolidated

13    the Hospira actions, Case Nos. 12-cv-1246-H and 12-cv-1582-H, on March 7, 2013.

14    ([1246][3] Doc. No. 37.)

15         On April 4, 2014, Plaintiff Ivera Medical Corporation filed a motion for

16    summary judgment in each consolidated action, and Defendants Excelsior Medical

17    Corporation and Hospira, Inc. filed cross-motions for summary judgment, including a

18    motion for patent invalidity. ([1115] Doc. Nos. 71 & 73; [1246] Doc. Nos. 133 & 136;

19    [954] Doc. No. 82.) On April 18, 2014, Defendants Excelsior,[4] Hospira, and Catheter

20

21

22

23    _____

24        [1] "[954]" refers to <u>Ivera Medical Corporation v. Excelsior Medical Corporation</u>,
      No. 12-cv-954-H.

25        [2] "[1115]" refers to <u>Ivera Medical Corporation v. Excelsior Medical Corporation</u>,
26    No. 11-cv-1115-H.

27        [3] "[1246]" refers to <u>Ivera Medical Corporation v. Excelsior Medical Corporation</u>,
      No. 11-cv-1246-H.

28        [4]Excelsior lodged its opposition under seal. (<u>See</u> [1115] Doc. No. 98.)

Connections, Inc. filed their responses in opposition to Ivera's motions.[5] ([1115] Doc. No. 90; [1246] Doc. No. 146; [954] Doc. No. 93.) On April 21, 2014, the Court issued an order stating that it would address the issue of patent invalidity in all of the consolidated actions. ([954] Doc. No. 94.) On April 23, 2014, each party filed a reply. ([1115] Doc. Nos. 104 & 105; [1246] Doc. No. 151; [954] Doc. No. 95.)

The Court held a hearing on Tuesday, April 29, 2014. Jonathan Hangartner appeared on behalf of Ivera. John E. Flaherty, Mark Anania, and Michael Murphy appeared on behalf of Excelsior. Daniel A. Boehen, Joshua Reuben Rich, and Timothy R. Pestotnik appeared on behalf of Hospira. Edward F. O'Connor and Vicki E. Farrar appeared on behalf of Catheter Connections. The Court grants Defendants' motions for summary judgment of patent invalidity, denies Plaintiff's motions for summary judgment, and denies all other motions as moot.

### **Background**

The invention concerns devices for decontaminating medical implements, where the prototypical device is placed as a cap over the part of the medical implement (or "site") to be cleaned, swabbing the site with a cleaning agent pre-loaded into the device. See, e.g. '794 Patent, Abstract. Defendants' answers assert invalidity and non-infringement counterclaims, among other responses. ([1115] Doc. No. 24; [1246] Doc. No. 55; Doc. No. 14.)

Ivera asserts that Excelsior's SwabCap products, Hospira's LifeShield Effect-IV Cap products, and Catheter Connections's DualCap Solo products infringe some or all of the following patent claims: independent claims 12, 13, and 20 of the '794 Patent (in addition to dependent claims 15, 16, 18, and 21); independent claims 1, 7, 13, and 18 of the '302 Patent (in addition to dependent claims 2-6, 8-12, 14-17, and 19-21); and independent claims 1, 11, and 21 of the '514 Patent (in addition to dependent claims

---

[5]Ivera filed its corrected oppositions to Defendants Excelsior's and Hospira's motions for summary judgment on April 23, 2014. ([1115] Doc. No. 100; [1246] Doc. No. 149.)

2-8, 12-18, 20, 22-25, and 27).  (See Plaintiff's Amd. Infr. Contentions, [1115] Doc. No. 71-3; [1246] Doc. No. 133-3; and [953] Doc. No. 82-3.)  On October 2, 2013, the Court issued its Markman order construing the disputed claim terms. ([1115] Doc. No. 59.)

Excelsior petitioned the United States Patent and Trademark Office ("PTO") for inter partes reexamination of the '794, '302, and '514 patents on August 24, 2010, July 26, 2011, and June 26, 2012 respectively. ([1115] Doc. Nos. 47-20, 47-16, and 47-23.) On November 2, 2012, the Patent Office issued three office actions; the first invalidated claims 12-18, 20-21, and 23-24 of the '794 patent; the second invalidated claims 1-25 of the '302 patent; and the third invalidated claims 1-37 of the '514 patent. ([1115] Doc. Nos. 47-22, 47-18, and 47-26.)  The Patent Office issued actions closing prosecution (ACPs) confirming the decisions on May 10, May 14, and May 14, 2013. ([1115] Doc. Nos. 45-23, 45-19, and 45-27.)  On April 4, 2014, the PTO issued Right of Appeal Notices in the inter partes reexaminations for each of the patents-in-suit declaring all asserted claims to be invalid.  ([1115] Doc. No. 81.)

Defendants move for summary judgment on the grounds that the asserted claims of the patents-in-suit are in invalid due to anticipation and obviousness.  (See [1115] Doc. No. 73; [1246] Doc. No. 136; see also [954] Doc. No. 94.)  Defendants also move for summary judgment on the grounds that their products do not infringe the patents-in-suit.  (Id.) Plaintiff opposes and moves for summary judgment of infringement. ([1115] Doc. Nos. 71 & 100; [1246] Doc. No. 133& 149.)

## **Discussion**

### I. Legal Standard for Summary Judgment

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

1  (1986); Nat'l Ass'n of Optometrists & Opticians v. Harris, 682 F.3d 1144, 1147 (9th

2  Cir. 2012) cert. denied, 133 S. Ct. 1241 (2013).  A dispute is genuine if a reasonable

3  jury could return a verdict for the nonmoving party.  Anderson, 477 U.S. at 248.

4       A party seeking summary judgment bears the initial burden of establishing the

5  absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The moving

6  party can satisfy this burden in two ways: (1) by presenting evidence that negates an

7  essential element of the nonmoving party's case; or (2) by demonstrating that the

8  nonmoving party failed to establish an essential element of the nonmoving party's case

9  on which the nonmoving party bears the burden of proving at trial.  Id. at 322-23.

10  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary

11  judgment."  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626,

12  630 (9th Cir. 1987).  Once the moving party establishes the absence of genuine issues

13  of material fact, the burden shifts to the nonmoving party to set forth facts showing that

14  a genuine issue of disputed fact remains.  Celotex, 477 U.S. at 322.  The nonmoving

15  party cannot oppose a properly supported summary judgment motion by "rest[ing] on

16  mere allegations or denials of his pleadings."  Anderson, 477 U.S. at 256.  "The

17  'opponent must do more than simply show that there is some metaphysical doubt as to

18  the material fact.'"  Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 265–66 (9th Cir.

19  1991) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

20  (1986)).

21       When ruling on a summary judgment motion, the district court must view all

22  inferences drawn from the underlying facts in the light most favorable to the

23  nonmoving party.  Matsushita, 475 U.S. at 587.  The district court does not make

24  credibility determinations with respect to evidence offered.  See T.W. Elec., 809 F.2d

25  at 630-31 (citing Matsushita, 475 U.S. at 587).  Summary judgment is therefore not

26  appropriate "where contradictory inferences may reasonably be drawn from undisputed

27  evidentiary facts."  Hollingsworth Solderless Terminal Co. v. Turley, 622 F.2d 1324,

28  1335 (9th Cir. 1980).

## II.    Legal Standards for Obviousness

A claimed invention is obvious if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a). Obviousness is a legal question based on underlying factual determinations. Eisai Co. Ltd. v. Dr. Reddy's Lab., Ltd., 533 F.3d 1353, 1356 (Fed. Cir. 2008). "The factual determinations underpinning the legal conclusion of obviousness include 1) the scope and content of the prior art, 2) the level of ordinary skill in the art, 3) the differences between the claimed invention and the prior art, and 4) evidence of secondary factors." Id. (citing Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966)). Secondary factors include "commercial success, long felt but unsolved needs, failure of others, etc." KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 406 (2007) (quoting Graham, 353 U.S. at 17-18.) A patent issued by the PTO is presumed to be valid. Microsoft Corp. v. i4i Ltd. P'ship, 131 S.Ct. 2238, 2242 (2011). In order to overcome the presumption of validity, a party must prove invalidity by clear and convincing evidence. Id. But summary judgment may be appropriate if "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent." KSR Int'l Co. at 427.

A patent is likely to be obvious if it merely yields predictable results by combining familiar elements according to known methods. Id. at 416. "[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." Id. at 418. "If a person of ordinary skill in the art can implement a predictable variation, and would see the benefit of doing so, § 103 likely bars its patentability." Id. at 417. In determining obviousness, courts do not need to find "precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." Id. at 418.

A person of ordinary skill interprets the prior art "using common sense and appropriate perspective." Unigene Labs., Inc. v. Apotex, Inc., 655 F.3d 1352, 1361 (Fed. Cir. 2011) (citing KSR Int'l Co., 550 U.S. at 421). As the Supreme Court observed:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.

KSR Int'l Co., 550 U.S. at 421. The results of ordinary innovation are not patentable. Id. at 427. Furthermore, "when a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." KSR Int'l Co., 550 U.S. at 417 (quoting Sakraida v. AG Pro, Inc., 425 U.S. 273 (1976)).

**III.    Analysis**

**1.    Scope and Content of Prior Art**

Under the first element of the Graham test for obviousness, the Court determines the scope and content of the prior art. Graham, 383 U.S. at 17. At least three prior art references are relevant to the patents-in-suit: Hoang, Chin-Loy, and White. See U.S. Patent App. Pub. No. 2007/0112332; U.S. Patent No. 5,954,957; U.S. Patent No. 5,242,425. All predate the earliest application date of the patents-in-suit, and are from the same field of endeavor, namely, the decontamination of medical devices. See In re Clay, 966 F.2d 656, 659 (Fed. Cir. 1992) (holding that when "the art is from the same field of endeavor," it is analogous for a court's obviousness inquiry). The Court describes each in turn:

a.    Hoang

U.S. Patent Application Publication No. 2007/0112333 to Hoang et al. ("Hoang") teaches an antiseptic cap for sterile cleaning and maintaining patient line access vales (such as a luer valve) to reduce microbes on the valve's access portion. See Hoang, Brief Summary of the Invention. The cap includes a hood containing a pad impregnated with an antimicrobial agent, and it covers the valve's access portion when

the valve is not in use. Id., Abstract. The cap is designed to maintain an antiseptic environment and minimize the risk of infection from catheters that attach via the valves. Id. The design also discloses a foil seal to maintain the antimicrobial agent and provide a moisture barrier, as well as threads along the inside of the cap's opening to engage the valve. Id. ¶¶ 19-24.

### b. Chin-Loy

U.S. Patent No. 5,954,957 ("Chin-Loy,") discloses a cap that can be attached to certain hydraulic fitting ports of certain medical devices. U.S. Patent No. 5,954,957, Abstract. The medical devices are used for purifying and concentrating biological liquids, such as in blood dialysis. Id. col.1 ll.8-11. Chin-Loy discloses that the medical devices are normally sold in a sterile condition, with disposable caps that cover the device's ports until it can be used. Id. col.1 ll.39-42. The patent teaches an embodiment of the cap that includes a channel such that the cap may be fully attached but also permit venting of the medical device through the port while maintaining the internal sterile condition of the medical device until time of use. Id. col.2 ll.38-44. Chin-Loy discloses a preferred embodiment wherein the cap attaches to a blood port with the male part configured as an enlarged luer taper surrounded by a female threaded collar. Id. col.4 ll.23-30 & 50-57. Chin-Loy also discloses a channel formed when the cap is fully attached to a blood port of a medical device and "permits venting of the interior of the medical device through the blood port during sterilization of the medical device." Id. col.5 ll.1-20.

### c. White

U.S. Patent No. 5,242,425 ("White") discloses an antiseptic catheter assembly formed by an interconnection of male (tubular) and female (luer) members coupled to a self-sealing sanctum, as well as an outer protective cap that covers the coupling to maintain an antiseptic condition. U.S. Patent No. 5,242,425, col.2 ll.53-64. According to a preferred embodiment, the outer cap houses an absorbent material saturated with an antiseptic that contacts the coupling when the protective cap is engaged. Id. White

teaches an embodiment where the cap is spaced from the coupled assembly, forming a cavity that allows the "exterior surfaces" of the connector to be bathed with antiseptic when the cap is in place. Id. col.7 ll.23-35. The cap is provided with threads that engage threads on the connector to create a re-sealable connection. See id. Fig. 7; id. col.7 ll.36-38. White teaches that while the coupling requires "a very tight fit . . . so that the so that the two members are in a fluid tight relationship for low pressures," id. col.6 ll.40-48, the cap containing the antiseptic material "is sized to be slip-fit . . . and rests on [the] border rim or ledge" of the coupling, id. col.6 ll.9-15.

### 2. The Level of Ordinary Skill in the Art

The second element in the Graham test for obviousness requires the Court to determine the level of ordinary skill in the pertinent art. See Graham, 383 U.S. at 17-18. "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." Ryko Mfg. Co. v. Nu-Star, Inc., 950 F.2d 714, 718 (Fed. Cir. 1991). Factors to consider include the educational level of the inventor, the educational level of those who work in the relevant industry, and the sophistication of the technology involved. See id.

The parties' invalidity experts do not depart materially from one another in their proffered definitions of one having ordinary skill in the art. Defendant Excelsior's expert, Charles Clemens, concluded that a person of ordinary skill in the art "has at least a bachelor's degree in mechanical engineering, biomedical engineering, or a comparable field and at least 5-7 years of training and experience, or additional schooling in medical device design, including experience associated with 'single use' disposable administration set design." ([1115] Doc. No. 87-1, Ex. A, Clemens Report.) Defendant Hospira's expert, Neil J. Sheehan, opined that "one of ordinary skill in the art would have a mechanical engineering, biomedical engineering, or similar technical degree or equivalent work experience, and five to ten years of technical (design or development) work in the field." ([1246] Doc. No. 136-10, Ex. G, Sheehan Report.) Ivera's expert, Karl R. Leinsing, concluded that a person of ordinary skill in the art has

1   "a B.S. in mechanical engineering or equivalent education and training and at least one
2   to two years of experience in the medical device industry," but allowed that accepting
3   Defendants' experts definitions would not change his opinions. ([1115] Doc. No. 94-1
4   at 16; [1246] Doc. No. 148-1 at 16.)  The Court recognizes the level of ordinary skill
5   in the art to be a person with a bachelor's degree in mechanical engineering, biomedical
6   engineering, or a comparable field with anywhere from two to five years' work
7   experience in the disposable medical device industry.

8          **3.     Differences Between the Prior Art and the Claimed Inventions**

9          The next <u>Graham</u> element analyses requires the Court to determine whether there
10  are material differences between the teachings found in the prior art and the claimed
11  invention, from the vantage point of a hypothetical person with ordinary skill in the art.
12  <u>Graham</u>, 383 U.S. at 17-18.  "It is elementary that the claimed invention must be
13  considered as a whole in deciding the question of obviousness." <u>Litton Indus. Prods.</u>
14  <u>v. Solid State Sys. Corp.</u>, 755 F.2d 158, 164 (Fed. Cir. 1985)

15         The patents-in-suit share the same specification and broadly disclose a cleaning
16  device for medical implements. <u>Compare</u> '794 Patent, '302 Patent, <u>and</u> '514 Patent.
17  The invention includes a cap with an inner cavity and an opening to that cavity which
18  is adapted to receive the medical implement. <u>Id.</u>  The patents disclose a compressible
19  cleaning material, pre-loaded with a cleaning agent, within the cavity before it receives
20  the site of the medical implement to be sterilized. <u>Id.</u>, col.2 ll.15-26.  Similarly, the
21  relevant prior art discloses similar elements.

22         "When a patent 'simply arranges old elements with each performing the same
23  function it had been known to perform' and yields no more than one would expect from
24  such an arrangement, the combination is obvious." <u>KSR Int'l Co.</u>,550 U.S. at 417
25  (quoting <u>Sakraida v. AG Pro, Inc.</u>, 425 U.S. 273 (1976)).  Here, the patents-in-suit
26  contain the same elements that perform the same functions they had been known to
27  perform in the prior art.  For example, Claim 13 of the '794 Patent provides for:
28  ///

A cleaning device for a medical implement, the cleaning device comprising:

a cap having a first opening to an inner cavity, an inner surface of the first opening including one or more threads adapted to receive a site of the medical implement;

a cleaning material formed of a compressible material that is at least partially secured in the inner cavity, the cleaning material containing a cleaning agent;

a second opening in the cap to allow evaporation of the cleaning agent from the inner cavity and to inhibit a buildup of pressure in the cap when the cleaning material is compressed by the site of the medical implement and a removable covering that covers the first opening and the second opening to the inner cavity prior to coupling the threads of the cap with the site of the medical implement via the first opening.

('794 Patent, col.10 ll.1-17.)  Claim 1 of the '302 Patent provides for:

A cleaning device for a medical implement, the cleaning device comprising:

a cap having an opening to an inner cavity, the opening for receiving a site of the medical implement;

threading at least partially around an inside surface of the cap near a periphery of the opening to the inner cavity, the threading to engage corresponding threads on the site of the medical implement;

a compressible cleaning material in the inner cavity and containing a cleaning agent, the compressible cleaning material adapted to swab and clean the site with the cleaning agent;

at least one aperture to the inner cavity to allow venting from the inner cavity when the opening receives the site of the medical implement; and

a removable seal attached to the cap at the opening to cover the opening and to maintain the compressible cleaning material and cleaning agent within the inner cavity prior to receipt of the site of the medical implement.

('302 Patent, col.8 ll.50 - col.9 l.2.)  Additionally, Claim 1 of the '514 Patent provides for:

A cleaning device for a medical implement, the cleaning device comprising:

a cap having an opening to an inner cavity, the opening for receiving a site of the medical implement;

one or more protrusions extending inwardly at least partially around an inside surface of the cap near a periphery of the opening to the inner cavity, the one or more protrusions to engage an outer surface of the site of the medical implement to maintain the cap on the site of the medical implement;

a cleaning agent that occupies at least some of the inner cavity, the cleaning agent being formulated to clean the site when the opening of the cap receives the site of the medical implement;

at least one aperture to the inner cavity to allow venting from the inner cavity when the opening of the cap receives the site of the medical implement; and

a removable seal that covers the opening to maintain the cleaning

agent within the inner cavity prior to receipt of the site of the medical implement.

('514 Patent, col.8 l.54 - col.9 l.6.)  These representative claims teach a first opening for receiving the medical implement, in addition to a second opening or aperture to allow venting or evaporation from the inner cavity.  The Court's October 2, 2013 claim construction construed the meaning of "second opening" as "a second, distinct channel or pathway that extends from the interior to the exterior of the cap."[6] ([1115] Doc. No. 59.)  In the final analysis, the invention as a whole claims a disinfecting cap with a foil seal pre-loaded with cleaning agent having a first opening that receives the medical implement to be cleaned, and a second opening or aperture to allow venting.

Comparing the claimed invention to the prior art, the arrangement of elements in the asserted claims do not yield anything other than predictable results.  Plaintiff's validity expert admitted that such a result would not be unexpected to a person of ordinary skill in the art.  (See [1115] Doc. No. 94-1 Leinsing Report ("In my opinion it was predictable that caps practicing the claimed invention reduce somewhat the incidence of bloodstream infections.")) Defendants contend that it would be obvious to a person of ordinary skill in the art to combine Hoang with the benefits provided by the second openings or apertures found in Chin-Loy and White.  "Common sense teaches . . . that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle."  KSR Int'l Co., 550 U.S. at 420.

///

---

[6] Other asserted claims have additional limitations.  For instance, certain claims require a seal to cover both the device's first opening and its second opening or aperture, (e.g. '794 Patent Claims 12, 13, 15, 18, 20 and 21; '302 Patent Claims 7-12 & 18-21), whereas other claims require the seal to cover the device's first opening and not necessarily a second opening or aperture, (e.g., '514 Patent Claims 1-8, 11-18, and 21-25; '302 Patent Claims 1-6).  The Court incorporates by reference its analysis of the asserted claims in its order denying Defendant Catheter Connection's motion for summary judgment of non-infringement.  ([954] Doc. No. 78.)

1    A patent that is merely a combination of familiar elements, when combined using

2    known methods that produces predictable results, is likely obvious. <u>KSR Int'l Co.</u>, 550

3    U.S. at 418. The inquiry is whether, to a person of ordinary skill in the art, it would be

4    obvious to modify Hoang to create a device with a second opening or aperture that

5    vented cleaning agent. <u>See</u> <u>Smith & Nephew, Inc. v. Rea</u>, 721 F.3d 1371, 1380-81

6    (Fed. Cir. 2013) (citing <u>KSR Int'l Co.</u>, 550 U.S. at 417). The Court notes little

7    difference between the subject matter of the patents-in-suit and the Hoang reference,

8    except that Hoang does not explicitly disclose a second opening or aperture that allows

9    the device to vent the cleaning agent.[7]

10   Here, modifying Hoang to add a second opening or aperture would yield

11   predictable results: it would allow the cleaning agent to vent after the cap placed on the

12   luer valve. A person of ordinary skill in the art would not need the benefit of hindsight

13   to realize that adding a vent would relieve possible pressure on the inside of the cap.

14   One having ordinary skill in the art would also see the benefit that the Chin-Loy

15   patentees saw: that having a channel formed when the cap is fully attached "permits

16   venting of the interior of the medical device through the blood port during sterilization

17   of the medical device." Chin-Loy, col.5 ll.1-20. In addition, such a change would

18   allow the cleaning agent to vent onto the exterior of the medical implement, sterilizing

19   a larger portion of it. This benefit was expressly observed in White, teaching an

20   alternative embodiment where the outer cap, containing a sponge soaked with

21   antiseptic, "is spaced from proximal member or injection cap 82 to permit antiseptic

22   to bathe the exterior surfaces of distal member 70, proximal member 82, and

23   self-sealing septum." White, col.7 ll.23-35. "[I]f a technique has been used to improve

24   one device, and a person of ordinary skill in the art would recognize that it would

25   improve similar devices in the same way, using the technique is obvious unless its

26

27        [7] To the extent that Defendants Excelsior and Hospira move for summary
     judgment on the grounds that Hoang wholly anticipates the asserted claims under 35
28   U.S.C. § 102, the Court denies their motions.

1   actual application is beyond his or her skill." <u>KSR Int'l Co.</u>, 550 U.S. at 417.

2        Obviousness is a question of law for the Court. <u>KSR Int'l Co.</u>, 550 U.S. at 427.

3 Like the PTO's conclusion of obviousness under its standards,[8] the Court concludes

4 that Hoang, in view of either Chin-Loy or White, renders the asserted claims invalid

5 for obviousness under <u>Graham</u>. Here, the differences between the subject sought to be

6 patented and the prior art are such that the subject matter as a whole would have been

7 obvious at the time that the invention was made to a person having ordinary skill in the

8 art. 35 U.S.C. § 103(a). Considering the prior art, the scope of the patent claims, and

9 the level of skill in the art, the record demonstrates no triable issue of material fact on

10 obviousness for the asserted claims of the patents-in-suit. <u>See, e.g.</u>, <u>Media Tech.</u>

11 <u>Licensing, LLC v. Upper Deck Co.</u>, 596 F.3d 1334, 1339 (Fed. Cir. 2010) (affirming

12 a district court's summary judgment of obviousness on the grounds that, inter alia,

13 defendants met their burden to show that a person of ordinary skill would have

14 combined the prior art references).

15     **4.    Secondary Considerations**

16        Additionally, the record demonstrates no triable issue of material fact on

17 secondary factors of non-obviousness to rebut the conclusion that the asserted claims

18 of the patents-in-suit are obvious. Ivera's oppositions to Defendants' motions rest on

19 the expert reports of Mr. Leinsing and Mr. Kennedy in a conclusory fashion. ([1115]

20 Doc. No. 100 at 22; [1246] Doc. No. 147 at 29.) The reports present expert opinion

21 testimony that Ivera's invention filled a long-felt but unmet need, yielded unexpected

22 results, and experienced commercial success, but even drawing all factual inferences

23

24         [8] The Court takes judicial notice that all asserted claims have been rejected on

25 multiple grounds in Rights of Appeal Notices that the PTO issued in the inter partes reexamination proceedings. ([1115] Doc. No. 81.) <u>See</u> <u>Function Media, L.L.C. v.</u>

26 <u>Google Inc.</u>, 708 F.3d 1310, 1316 n.4 (Fed. Cir. 2013) (taking judicial notice of a PTO action holding all asserted claims invalid on reexamination); <u>Old Reliable Wholesale,</u>

27 <u>Inc. v. Cornell Corp.</u>, 635 F.3d 539, 549 (Fed. Cir. 2011) ("Although the results of the PTO reexamination proceedings were not available to the district court, this court can

28 take judicial notice [of them].").

A00020

in Plaintiff's favor, it is not enough to present a triable issue of material fact on obviousness as a matter of law. "Where, as here, the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate." KSR Int'l Co., 550 U.S. at 427. The asserted claims encompassed obvious subject matter regardless of evidence of secondary factors, and as a result fail to meet the requirement of § 103.

### Conclusion

The Court grants Defendants' motions for summary judgment on the issue of validity and invalidates the asserted claims of the patents-in-suit for obviousness. Accordingly, the Court denies the pending motions as moot.[9]

**IT IS SO ORDERED.**

DATED: April 29, 2014

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

---

[9]The Court denies as moot Excelsior's motions to exclude expert testimony and to stay ([1115] Doc. Nos. 82 & 74); denies Hospira's motion to stay, motion in limine, and two motions to preclude expert testimony ([1246] Doc. Nos. 141 & 152-154); and denies Catheter Connections's motion to stay ([954] Doc. No. 87).

US007780794B2

(12) **United States Patent**
Rogers et al.

(10) Patent No.: **US 7,780,794 B2**
(45) Date of Patent: **Aug. 24, 2010**

(54) **MEDICAL IMPLEMENT CLEANING DEVICE**

(75) Inventors: **Bobby E. Rogers**, San Diego, CA (US); **Paul DiPerna**, San Clemente, CA (US)

(73) Assignee: **Ivera Medical Corporation**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 591 days.

(21) Appl. No.: **11/705,805**

(22) Filed: **Feb. 12, 2007**

(65) **Prior Publication Data**

US 2008/0019889 A1     Jan. 24, 2008

**Related U.S. Application Data**

(60) Provisional application No. 60/832,437, filed on Jul. 21, 2006, provisional application No. 60/850,438, filed on Oct. 10, 2006.

(51) **Int. Cl.**
*B08B 17/04* (2006.01)
*A61M 39/16* (2006.01)

(52) **U.S. Cl.** ............................. **134/6**; 15/97.1; 604/533

(58) **Field of Classification Search** .............. 15/104.92, 15/104.93; 134/6; 604/533
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,752,983 A     6/1988     Grieshaber

| | | | | |
|---|---|---|---|---|
| 6,116,468 A | * | 9/2000 | Nilson | ........................ 222/108 |
| 6,250,315 B1 | | 6/2001 | Ernster | |
| 2005/0214185 A1 | | 9/2005 | Castaneda | |
| 2007/0112333 A1 | | 5/2007 | Hoang et al. | |

FOREIGN PATENT DOCUMENTS

WO     2007137056     11/2007

OTHER PUBLICATIONS

PCT Form ISA 220, PCT Notification of Transmittal of the International Search Report and the Written Opinion of the International Searching Authority, dated Jul. 22, 2009, issued in connection with corresponding PCT Application PCT/US2008/053744.

* cited by examiner

*Primary Examiner*—Michael Kornakov
*Assistant Examiner*—Natasha Campbell
(74) *Attorney, Agent, or Firm*—Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC

(57) **ABSTRACT**

A cleaning device for a medical implement is disclosed. The cleaning device includes a cap having an opening to an inner cavity, the opening being adapted to receive a site of the medical implement. The cleaning device further includes a compressible cleaning material that contains a cleaning agent prior to receipt of the site of the medical implement, i.e. the cleaning material is pre-loaded with the cleaning agent. The compressible cleaning material is at least partially secured in the inner cavity and adapted to swab and clean the site with the cleaning agent.

**24 Claims, 7 Drawing Sheets**





FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9

FIG. 10



FIG. 11



FIG. 12



FIG. 13

FIG. 14

US 7,780,794 B2

1

# MEDICAL IMPLEMENT CLEANING DEVICE

## CROSS REFERENCE TO RELATED APPLICATIONS

The present patent application claims priority under 35 U.S.C. §119 to U.S. Provisional Patent Application Ser. No. 60/832,437 filed on Jul. 21, 2006, entitled "DISINFECTING CAP", and to U.S. Provisional Patent Application Ser. No. 60/850,438 filed on Oct. 10, 2006, entitled "DISINFECTING CAP" the entire disclosures of which are incorporated by reference herein.

## BACKGROUND

Within the medical field, and in particular the area of infusion of fluids or aspiration of fluids to or from a patient, there is a need to prevent the transmission of pathogens into or onto a patient from a potentially contaminated surface of a medical implement, or "site". Such pathogens include microorganisms such as bacteria and viruses. The transmission of pathogens into a patient may result in an infection that could be life threatening. Specific to healthcare settings, the term "nosocomial infection" describes those infections that originate from or occur in a hospital or hospital-like setting. In the U.S., nosocomial infections are estimated to occur in at least 5% of all acute care hospitalizations. The estimated incidence is more than two million cases per year, resulting in an added expenditure in excess of $4.5 billion. Nosocomial infections are estimated to more than double the mortality and morbidity risks of any admitted patient, and likely result in about 90,000 deaths a year in the United States. Common sites for such transmissions are found on such medical implements as a luer port, vial, needle free valve, or an injection port of a vessel, tubing, or catheter. Even non-intrusive medical implements such as stethoscopes can transmit pathogens to a patient. The incidence of infection in patients is presently numerous and increasing, and Infection Control Practitioners (ICP's) often cite improper cleaning of sites as a major source of these infections.

Traditionally, cleaning a potentially contaminated surface includes a protocol of alcohol swabbing prior to making the necessary connections to the site. Today alcohol swabs, a small pad of cotton gauze soaked in isopropyl alcohol, are packed individually in a foil package. The foil package is relatively inexpensive, and is used to retain the alcohol within the package and to prevent evaporation. Properly used, the package is opened at or near the site to be swabbed. With gloved hands, the pad is removed by a healthcare provider and wiped across the top and side surfaces of the site, and the pad and foil package are discarded. The site should be allowed to dry, usually twenty to thirty seconds, immediately prior to making any connection. This "drying" period is important: when alcohol dries, it breaks open the cellular walls of microorganisms, thereby killing them.

Unfortunately, because of increased duties and responsibilities, shrinking nursing staffs, and inadequate training, swabbing is often overlooked or is poorly executed. A poorly swabbed site can carry microorganisms that, if allowed to enter a patient's body, can cause serious infection. In addition, supervisory oversight is nearly impossible, because unless a supervisor can actually observe the swabbing being performed, the supervisor cannot know whether or not it was done properly or performed at all. Further, without at least a sufficient microscopic examination for microbial residue, there may be no evidence of an alcohol swab being performed. Thus, a need exists for an apparatus and technique for

2

cleaning a site on a medical implement prior to contact with a patient, and which will eliminate technique-related issues and training issues, and provide an unequivocal indicator that a site is clean prior to accessing a patient's vascular system.

## SUMMARY

A cleaning device, system and method for a medical environment is disclosed. In one aspect, the cleaning device includes a cap having an opening to an inner cavity, the opening being adapted to receive a site of the medical implement. The cleaning device further includes a compressible cleaning material that contains a cleaning agent prior to receipt of the site of the medical implement, i.e. the cleaning material is pre-loaded with the cleaning agent. The compressible cleaning material is at least partially secured in the inner cavity and adapted to swab and clean the site with the cleaning agent.

In another aspect, a cleaning system for a threaded medical implement includes a cap having an inner cavity and an opening to receive a site of the medical implement into the inner cavity. The system further includes a threaded ring connected to the inner cavity at the opening to the cap, and having threads that correspond to threads on the threaded medical implement. The system further includes a cleaning material in the inner cavity adapted to provide radial compression against the threaded medical implement, the cleaning material containing a cleaning agent prior to receipt of the site of the medical implement. The opening is preferably covered by a removable vacuum seal.

In yet another aspect, a method of cleaning a site of a medical implement includes the steps of at least partially saturating a cleaning material with a cleaning agent in an inner cavity of a cap; and contacting a top of the site of the medical implement to a first portion of the cleaning material. The method further includes steps of compressing the first portion of cleaning material with the site of the medical implement to contact a side of the site with a second portion of the cleaning material provided around the first cleaning material, and attaching the cap over the site of the medical implement.

In yet another aspect, a cleaning device for a medical implement includes a cap having an opening to an inner cavity, an inner surface of the opening including one or more threads adapted to receive a site of the medical implement. The cleaning device further includes a cleaning material formed of a compressible material that is at least partially secured in the inner cavity, the cleaning material containing a cleaning agent.

In still yet another aspect, a cleaning system for a medical environment includes a plurality of caps. Each cap includes an inner cavity and an opening to receive a site of the medical implement into the inner cavity, and a cleaning material in the inner cavity adapted to provide radial compression against a site of a medical implement, the cleaning material containing a cleaning agent prior to receipt of the site of the medical implement. The system further includes a seal that covers the opening of each of the plurality of caps, and from which individual ones of the plurality of caps can be selectively removed to be used for cleaning the site of the medical implement.

The details of one or more embodiments are set forth in the accompanying drawings and the description below. Other

US 7,780,794 B2

3

features and advantages will be apparent from the description and drawings, and from the claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other aspects will now be described in detail with reference to the following drawings.

FIG. **1** is a cross-sectional, exploded view of a cleaning device.

FIG. **2** is a cross-sectional view of an assembled cleaning device.

FIG. **3** illustrates operation of a cleaning device for connection to a site of a medical implement.

FIG. **4** illustrates a cleaning device connected to a medical implement and cleaning a site of the medical implement.

FIG. **5** shows another embodiment of an assembled cleaning device.

FIG. **6** is a cross-sectional view of an assembled cleaning device in accordance with an embodiment.

FIG. **7** is a perspective view of another cleaning device.

FIG. **8** is a cross section of a cleaning device.

FIGS. **9** and **10** show a cleaning device being used to clean a site of a medical implement.

FIG. **11** is a perspective view of a ring that attaches to a corresponding structure of a medical implement.

FIG. **12** is a cross sectional view of another alternative embodiment of a cleaning device.

FIG. **13** shows yet another alternative embodiment of a cleaning device.

FIG. **14** shows a cap of a cleaning device in accordance with some embodiments.

Like reference symbols in the various drawings indicate like elements.

## DETAILED DESCRIPTION

In accordance with preferred embodiments, a cleaning device includes a cap having a shape and/or external features to promote easy gripping and a cleaning material in the cap that holds or is in contact with a cleaning agent, such as isopropyl alcohol, for application of the cleaning agent to a site of a medical implement.

The cleaning material can be any substance that can conform, mold or compress in a manner that enables the effective wiping of the site, including the top surface of the site, side surface, and any threads or grooves, if present, and provide the cleaning agent at least at a surface level. Examples of the cleaning material include cotton, open or closed cell foam such as polyethylene foam, or other substance that can hold or carry the cleaning agent. The cleaning agent can be any chemical, substance or material that cleans the site of bacterial or even viral microorganisms, or any carrier that contains such chemical, substance or material. Examples of a cleaning agent include isopropyl alcohol, chlorhexidine, povidone-iodine, hydrogen peroxide, soap, and hydrochloric acid.

The term "medical implement" is used to denote any tool or object that can be used in a medical setting and that can connect to a site cleaning device as described herein according to a number of embodiments. Examples of medical implements include, but are not limited to, access ports on tubing sets (extension sets, T-connectors and IV sets), access ports on catheters (both peripheral and central lines), needle free valves, stopcocks, luer connectors, stethoscopes and other components or devices whereby regular cleaning is desired. Medical implements are commercially available in standard

4

sizes. Thus, the end or opening of a site cleaning device can be provided with fittings to accommodate such standard size medical implements.

The cap of the cleaning device is made of a material that is compatible with the cleaning materials and agents to be used, examples of materials would include, sealed foam, plastic, glass, or metal. The cleaning device may need to undergo sterilization. For securing the cleaning device to another device, the cleaning device can include attachment mechanisms such as "snap-fit" mechanisms or clamps to hold it in place on the other device. Alternatively the cleaning material in the cap may conform to the sides of the medical implement to thereby "grip" and remain secured to the medical implement. The cap also may have threading to secure it in place on a medical implement. The cap may have some cutaway portions on its walls to enable the use of some undercuts during the molding process, and to allow the cleaning material to flex outward both during use. The cap can be made from polyethylene or another material that is stable when in the presence of alcohol or other cleaning agent.

In preferred exemplary embodiments, prior to being applied to a site, and after the cleaning material is provided with a cleaning agent, the opening of the cap is sealed with a foil-based seal or other material suitable for retaining a cleaning agent in the cleaning material and preventing evaporation of the cleaning agent. The cap seal may also be formed in a manner whereby several caps could be attached i.e. a strip, where individual caps can be peeled from the strip in order to be used. These strips of caps can be made conveniently accessible, i.e. hung from intravenous (IV) poles or IV sets, in patient rooms and medication carts, to name just a few. The strips provide the convenience of having several caps available in one location.

The cleaning material in the cap can be an alcohol-soaked piece of gauze, foam or similar cleaning material. The cleaning material can be formed into the general interior shape of the cap from one or more pieces. For instance, the cleaning material can include a ring for circumscriptive coverage and cleaning of the site, and further include a cylinder within the ring for coverage and cleaning on a distal end of the site. A single piece of cleaning material may also be cut or formed to perform the same coverage and cleaning functions as the two pieces described above. The cleaning material may also cover the threads and/or be formed as part of the threads.

In still further embodiments, the cleaning material may be made entirely or partially of the cleaning agent. For example, the cleaning material can be formed of an open cell foam or plastic that is chemically or physically impregnated with a cleaning agent such as povidone or iodine, or isopropyl alcohol.

To further illustrate and describe these concepts, reference is now made to FIG. **1**, which shows a cross-sectional, exploded view of a cleaning device, embodied as a cap **10** with a housing **4** that defines an inner cavity **20** of the cap **10**. A foil seal **1** is configured to attach to a sealing surface **2** of the housing **4**. The housing **4** further includes internal threads **3**. In a preferred exemplary embodiment, the internal threads **3** are sized and arranged to accommodate luer threads, i.e. standardized male threads designed to mate with the female threads on a medical implement to which the cap **10** attaches. The housing **4** also has a mating surface **5** for attachment of a bottom portion **6**.

Within housing **4** is a first cleaning material **7**. The first cleaning material **7** may be attached to the walls of housing **4** by glue, solvent or some other attachment composition or mechanism, or may be held in the housing **4** by compression or trapped between the bottom portion **6** and housing **4**. Ribs

US 7,780,794 B2

5

or protrusions on the inside of the housing 4 may also be used to prevent the cleaning material 7 from slipping or rotating. The first cleaning material 7 is compressible, and is preferably doughnut-shaped or ring-shaped. The first cleaning material 7 is positioned and configured to compress radially in an outwardly direction to scrub or wipe the circumscriptive surface of the site and the surface of the threads of an inserted medical implement.

A second cleaning material 8 is designed to compress in the axial direction upon insertion of the medical implement and is designed to wipe the distal end and distal surface of the inserted medical implement. The second cleaning material 8 may be attached to the walls of bottom portion 6 by glue, solvent or some other attachment composition or mechanism, or affixed to first material 7 by glue, solvent or some other attachment composition or mechanism. Protrusions on the inside of the bottom portion 6 may also be used to prevent the cleaning material 8 from rotating or removal. The first cleaning material 7 and second cleaning material 8 may be formed from a single piece of compressible cleaning material of cotton, foam or other suitable cleaning material adapted for scrubbing. This single piece may be cut completely or partially cut to achieve a similar effect as two separate pieces of cleaning material.

FIG. 2 illustrates an assembled cap 10. The first and second cleaning materials 7 and 8 in the inner cavity 20 are at least partially saturated with a cleaning agent, such as isopropyl alcohol, or a mix of cleaning agents. The foil seal 1 is then attached to housing 4 at sealing surface 2 by glue, solvent, thermal bonding, etc. A bottom portion 6 is attached to housing 4 at point 5 by glue, welding, solvent, threads or other attachment mechanism or process. With the foil seal 1 and the bottom portion 6 attached to housing 4, the inner cavity 20 is hermetically sealed. The housing 4, bottom portion 6, and first and second cleaning materials 7, 8 are respectively made of a material or cleaning materials that are compatible with the cleaning agent. For instance, if isopropyl alcohol is used for at least part of the cleaning agent, the housing 4 and bottom portion 6 can be constructed of a plastic such as polyethylene. The housing 4 and bottom portion 6 can be formed of a unitary piece of material, as explained further below.

FIG. 3 illustrates a medical implement 30 moving toward housing 4, in a direction A, which should be recognized as a reference only, and that the housing 4 can likewise be moved toward the medical implement 30. The foil seal 1 is removed from housing 4. In alternative embodiments, the foil seal 1 can be a foil pouch or other sterilized material that would inhibit evaporation of the cleaning agent. A distal end surface 12 of the medical implement 30 is eventually contacted with the upper surface 50 of the second cleaning material 8.

As the medical implement 30 continues in direction A, it axially compresses second cleaning material 8 continuing to clean surface 12 with surface 50. This movement also begins to radially compress the first cleaning material 7 and to conform the first cleaning material 7 with, and begin scrubbing, threads 11. The cleaning materials 7 and 8 contain the cleaning agent so as to perform a thorough cleaning of the area about the threads 11 and the surface 12. As threads 11 of the medical implement 30 continue to be rotationally inserted into the threads 3 of the housing, the distal end surface 12 is automatically scrubbed by surface 50 of the second cleaning material 8 and cleaned by cleaning agent held therein, and at least a portion of the side and threads 11 of the medical implement 30 are automatically scrubbed by radial compression of the first cleaning material 7 and cleaned by a cleaning

6

agent held therein. FIG. 4 illustrates the disinfecting cap 10 with a fully inserted medical implement 30.

The cap 10 can be removed immediately from the medical implement 30 after use, or be kept in place. If the cap 10 is removed the medical implement 30 surfaces 11 and 12 will be clean and ready for use upon the drying of the cleaning agent. If the cap 10 is kept secured to medical implement 30, the cleaning agent in cap 10 will evaporate over time thereby destroying any microorganisms on the surfaces 12 and 11 of medical implement 30. The cap 10 then maintains the surfaces 11 and 12 of medical implement 30 in a clean and ready-to-access state by eliminating any forms of touch contamination.

FIGS. 5-10 illustrate an alternate embodiment of a cleaning device 100. FIG. 5 is a perspective view of the cleaning device 100 formed of a cap 102 with a seal 104 that is connected to and covers the opening of the cap 102. The cap 102 can have a number of gripping ridges or projecting members for ease of use. FIG. 6 is a cross-sectional view of the cleaning device 100. The cap 102 forms an inner cavity with one opening that is large enough to receive a site of a medical implement. The seal 104 is affixed to the opening and is preferably entirely removable. In other embodiments, the seal 104 is permanently affixed, and is simply punctured by insertion of a site of a medical implement.

The cap 102 houses a threaded ring 106 proximate to the opening. The threaded ring 106 includes one or more threads 105 and is adapted to receive the site of the medical implement to be disinfected, and thus defines the size and shape of the opening. This embodiment is advantageous because it creates a single circumferential seal point, seal 104 to the opening of cap 102.

In some embodiments, the cap 102 and threaded ring 106 are formed of a unitary piece of material or cleaning material. In other embodiments, the threaded ring 106 fits into a groove 109 that is formed in the inside edge surface of the cap 102 near the opening. In this latter configuration, the groove 109 maintains the position of threaded ring 106 near the open end of the cap where the threaded ring top surface may be flush with or slightly recessed from the cap open end walls, and the threaded ring 106 may also include or create with the cap wall a small vent aperture or opening to allow evaporation of a cleaning agent in the cap 102. The threaded ring 106 can be mechanically kept from rotating with internal ribs or protrusions in cap 102 or groove 109. Threaded ring 106 may be held in place within grove 109 and cap 102 by glue, welding, snap-fit, solvent bonding or any other mechanism or composition known to those of requisite skill.

The cleaning device 100 further includes a first cleaning material 10 that holds the cleaning agent, such as isopropyl alcohol, and a second cleaning material 108 that also holds or is at least partially saturated by the cleaning agent. In preferred exemplary embodiments, the first cleaning material 107 is formed as a hollow cylinder or ring positioned between the threaded ring 106 and the top inside surface of the cap 102, and is adapted for radial compression against a site that is inserted into the cap 102 or over which the cap 102 is placed. In some embodiments, the second cleaning material 108 is formed as a solid cylinder and positioned within the hollow space of the first cleaning material 107, and is adapted for axial compression against a leading edge of the site that is inserted into the cap 102 or over which the cap 102 is placed. In other embodiments, cleaning materials 107 and 108 can be made of a single piece of material and cut or formed so as to achieve the same result as described above. The cleaning agent is provided to the cleaning materials 107, 108 prior to the opening being covered with the seal 104.

7

FIG. **7** is a bottom perspective view and FIG. **8** is a cross-sectional view of the cleaning device **100** with the seal **104** removed, showing the cap **102**, threaded ring **106** that sits within the cap **102**, and the second cleaning material **108** inside the cap **102**. The second cleaning material **108** can extend to and slightly beyond the opening of the cap **102**. FIG. **8** further shows the first cleaning material **107** that circumscribes the second cleaning material **108** and being positioned between the threaded ring **106** and the top inner surface of the cap **102**. FIG. **11** illustrates an example of the threaded ring **106** and its threads **105**. An attribute of this embodiment of the threaded ring **106** shown in FIG. **11** is that there are only two opposing threads that travel 180 degrees before terminating. This enables the molding of threaded ring **106** without the use of a screw to create the thread feature in an injection molding tool. The threaded ring **106** can also be produced with an injection molding tool utilizing a screw.

FIG. **9** illustrates the cleaning device **100** about to make contact with a site **120** of a medical implement. As discussed above, the site **120** can be a luer port, a, a needle free valve, an injection port of a vessel, or other medical implement that needs to be cleaned prior to use with a patient. In some embodiments, the site **120** can include a set of threads **122** that correspond to the threads **105** in the threaded ring **106** of the cleaning device **100**. The cleaning materials **107** and **108** are preloaded with a cleaning agent, before removal of the seal and contact by the site **120**. Accordingly, as shown in FIG. **10**, the site **120** makes contact with the cap **102** by a screwing motion relative to the cap **102**. The second cleaning material **108** is compressed axially and swabs against the leading edge of the site **120**, while the first cleaning material **107** is compressed radially and swabs against sides of the site **120**.

FIG. **11** illustrates the molded thread ring **106** with two opposing threads **105** that traverse opposing 180 degree portions of the ring. This design enables the thread ring **106** to be molded without the use of a screw that is typically used to create threaded parts in a molding process. Thus the threaded ring **106** can be manufacture very inexpensively. The threaded ring **106** can also clean some of the threads when the cap is placed into position, and may or may not cover all the threads. In some embodiments, the threaded ring **106** can be molded from the cleaning material, or the cleaning material is formed only of the threaded ring **106**. In such embodiments, the cleaning may only occur on threads of the site and in an axial direction.

FIG. **12** shows an alternative embodiment of a cleaning device **130** having a cap **132** that is filled with a cleaning material. The cap **132** has side walls **134** and a top **136** that define an inner cavity with an opening **132**. The cleaning material includes at least a first cleaning material **138**, such as cotton or foam, that delivers a cleaning agent. The cleaning material can include a second cleaning material **140** to hold more cleaning agent. In some embodiments, the second cleaning material **140** can be circumscribed by the first cleaning material **138**. Alternatively, the first cleaning material **138** can completely envelope the second cleaning material **140**, each providing their own compressibility and capacity to hold a cleaning agent. Still, in other embodiments, the first and second cleaning materials **138**, **140** can be formed of a single piece of material. The cleaning material(s) are filled at least partially with a cleaning agent, prior to sealing of the opening **132** with a seal and closure of the inner cavity.

FIG. **13** shows an alternate embodiment of a cleaning device **150**. In this embodiment, the cleaning device **150** includes a housing **152** that is formed as a threaded cap. The inner surface of the housing **152** is covered, at least in part, by

8

a cleaning layer **154** that is bonded to the inner surface of the housing **152**. The cleaning layer **154** can be a cleaning material such as cotton, foam, or other porous and pliable material that suitably holds and/or delivers a cleaning agent such as isopropyl alcohol. The cleaning layer **154** is sized and positioned inside the housing **152** so as to be able to swab the top and a portion of the sides of a part of a medical implement that is inserted therein, or over which the housing **152** is placed. Accordingly, the cleaning layer **154** can have any thickness or compressibility.

FIG. **14** shows yet another alternative embodiment of a cleaning device **160**, illustrating an outer view of a rounded housing **162** for an expanded inner chamber to hold more cleaning agents or cleaning materials that hold such agents. Holes **164** in the housing **162** can promote evaporation of the cleaning agent, particularly when the housing covers a site of a medical implement to be disinfected. The location of the vent holes is variable and the vent holes can also be sealed with a filter type membrane that permits the drying of the cleaning agents but does not allow entry of microorganisms or fluid.

The use of the various implementations and embodiments above entails the following: the healthcare worker would, with gloved hands, open the foil package and place this cap over the site of a medical implement to be cleaned. Upon placement the alcohol soaked cleaning material wipes all of the port's surfaces. This wipe could be accomplished by either a turning motion (if threads are used) or by simply pushing the cap onto the port. In this way the cap eliminates errors in the practice of swabbing due to poor training or excessive workloads. The cap would then remain secured in place by threads, mechanical tension provided by the foam, cotton, etc., snaps or some other mechanism. A cap in place on a medical implement is a positive indication that a desired site of the medical implement is clean. A vibrant color may be used to allow instant visualization of a cap's presence from a door or hallway. ICP's can review compliance by merely observing sites to see whether or not a cap is in place. The cap could remain in place for periods of up to three days or more. For extended periods the alcohol will likely evaporate, which assures that the site is clean. With the cap in place, it continues to keep the site clean even after the alcohol has evaporated.

Although a few embodiments have been described in detail above, other modifications are possible. For instance, any of the embodiments described above may be sized and scaled for a particular medical implement, such as a stethoscope. Other embodiments may be within the scope of the following claims.

What is claimed is:

**1**. A cleaning device for a medical implement, the cleaning device comprising:

a cap having a first opening to an inner cavity, the opening being adapted to receive a site of the medical implement a threaded ring connected to the cap at a periphery of the opening to the inner cavity, the threaded ring providing threading;

a compressible cleaning material that contains a cleaning agent prior to receipt of the site of the medical implement, the compressible cleaning material at least partially secured in the inner cavity and adapted to swab and clean the site with the cleaning agent; and

an additional opening in the cleaning device formed between an outside edge of the threaded ring and an inside edge of the inner cavity to allow evaporation of the cleaning agent from the inner cavity and to inhibit a vacuum in the cap when the first opening receives the site of the medical implement.

US 7,780,794 B2

9                                                                                    10

**2**. A cleaning device in accordance with claim **1**, wherein the cleaning material includes a first cleaning material that forms a ring in the inner cavity, and a second cleaning material that forms a cylinder within the first cleaning material.

**3**. A cleaning device in accordance with claim **1**, wherein the cap includes an outer surface having a plurality of vertical ridges.

**4**. A cleaning device in accordance with claim **1**, further comprising a removable seal connected to the cap over the opening to the inner cavity.

**5**. A cleaning system for a threaded medical implement, the cleaning system comprising:

a cap having an inner cavity and an opening to receive a site of the medical implement into the inner cavity;

a threaded ring connected to the inner cavity at the opening to the cap, and having threads that correspond to threads on the threaded medical implement;

a cleaning material in the inner cavity adapted to provide radial compression against the threaded medical implement, the cleaning material containing a cleaning agent prior to receipt of the site of the medical implement; and

one or more vent holes between the threaded ring and the inner cavity at the opening to the cap, the one or more vent holes to permit drying the cleaning agent and to inhabit a vacuum in the inner cavity to support mechanical tension by the threads on the threaded medical implement.

**6**. A cleaning system in accordance with claim **5**, wherein the cleaning material is further adapted to provide axial compression against the threaded medical implement.

**7**. A cleaning system in accordance with claim **5**, wherein the cap and the threaded ring are formed of a unitary piece of material.

**8**. A cleaning system in accordance with claim **6**, wherein the cleaning material is formed of a first cleaning material to provide the radial compression against the threaded medical implement, and a second cleaning material to provide the axial compression against the threaded medical implement.

**9**. A cleaning system in accordance with claim **5**, wherein the cleaning agent includes isopropyl alcohol.

**10**. A cleaning system in accordance with claim **5**, wherein the cap includes an outer surface having a plurality of vertical ridges.

**11**. A cleaning system in accordance with claim **5**, further comprising a removable seal connected to the lower edge of the cap to cover the opening to the inner cavity.

**12**. A method of cleaning a site of a medical implement, the method comprising:

at least partially saturating a cleaning material with a cleaning agent in an inner cavity of a cap that includes an opening to the inner cavity and at least one other aperture to the inner cavity the cap further including a removable seal that encloses the opening and the at least one other aperture; removing the seal from the opening and the at least one other aperture;

contacting a top of the site of the medical implement to a first portion of the cleaning material;

compressing the first portion of cleaning material with the site of the medical implement to contact the site with the cleaning agent in the cleaning material provided around the first cleaning material;

attaching the cap over the top of the site of the medical implement; and

evaporating the cleaning agent through the at least one other aperture to the inner cavity as the cap is attached over the top of the site.

**13**. A cleaning device for a medical implement, the cleaning device comprising:

a cap having a first opening to an inner cavity, an inner surface of the first opening including one or more threads adapted to receive a site of the medical implement;

a cleaning material formed of a compressible material that is at least partially secured in the inner cavity, the cleaning material containing a cleaning agent;

a second opening in the cap to allow evaporation of the cleaning agent from the inner cavity and to inhibit a buildup of pressure in the cap when the cleaning material is compressed by the site of the medical implement and a removable covering that covers the first opening and the second opening to the inner cavity prior to coupling the threads of the cap with the site of the medical implement via the first opening.

**14**. A cleaning device in accordance with claim **13**, wherein the cleaning material is adapted to provide radial compression against the site of the medical implement for radial swabbing of the site.

**15**. A cleaning device in accordance with claim **13**, wherein the cleaning

material is adapted to provide axial compression against the site of the medical implement for axial and rotational swabbing of the site of the medical implement when the site is rotated into the first opening of the cap.

**16**. A cleaning device in accordance with claim **13**, wherein the compressible material includes an open-cell foam.

**17**. A cleaning device in accordance with claim **13**, wherein the cleaning material includes a first cleaning material to provide the radial compression against the site of the medical implement, and a second cleaning material to provide the axial compression against the site of the medical implement.

**18**. A cleaning device in accordance with claim **13**, wherein the cleaning material is preloaded with the cleaning agent prior to a seal being applied to the first and second openings of the cap.

**19**. A cleaning system for a medical environment, the cleaning system comprising:

a plurality of caps, each cap having:

an inner cavity and an opening to receive a site of the medical implement into the inner cavity; and

a cleaning material in the inner cavity adapted to provide axial compression against a site of a medical implement, the cleaning material containing a cleaning agent prior to receipt of the site of the medical implement; and a threaded ring connected to the inner cavity at the opening to the cap, the threaded ring having threads that correspond to threads on the medical implement; and

at least one evaporation vent in a wall of the cap between the threaded ring and the inner cavity at the opening to allow evaporation of the cleaning agent upon receipt of the site of the medical implement; and

a seal that covers the opening of each of the plurality of caps, and from which individual ones of the plurality of caps can be selectively removed to be used for cleaning the site the site of the medical implement.

**20**. A cleaning device for a medical implement, the cleaning device comprising: a cap having an opening to an inner cavity, the opening for receiving a site of the medical implement; a threading at a periphery of the opening to the inner cavity; a compressible cleaning material that contains a cleaning agent, the compressible cleaning material at least partially secured in the inner cavity and adapted to swab and clean the site of the medical implement with the cleaning agent; at least

US 7,780,794 B2

11

one second opening proximate the opening to the inner cavity to allow evaporation of the cleaning agent from the inner cavity and to inhibit a vacuum in the cap when the opening receives the site of the medical implement; and a removable seal attached to the cap at the opening to cover the opening and the second opening, and to maintain the compressible cleaning material and cleaning agent within the inner cavity prior to receipt of the site of the medical implement.

**21**. The cleaning device in accordance with claim **20**, wherein the second opening is formed by a gap in the threading.

**22**. The cleaning device in accordance with claim **20**, wherein the second opening is formed by a gap between an outside edge of a threaded ring connected to the cap at the opening, and an inside edge of the inner surface of the cap.

**23**. A cleaning device for a medical implement, the cleaning device comprising: a cap having an opening to an inner cavity, the opening being sized for receiving a site of the

12

medical implement; a compressible cleaning material that contains a cleaning agent, the compressible cleaning material at least partially secured in the inner cavity and adapted to swab and clean the site of the medical implement with the cleaning agent; means for venting the cleaning agent from the compressible cleaning material and the inner cavity, the means for venting being created between the cap and the site of the medical implement when the site of the medical implement is received in the opening of the cap; and a removable seal attached to the cap at the opening to cover the opening and to maintain the compressible cleaning material and cleaning agent within the inner cavity prior to receipt of the site of the medical implement.

**24**. The cleaning device in accordance with claim **23**, wherein the compressible cleaning material is formed to clean both a front face and sides of the site of the medical implement.

\*    \*    \*    \*    \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,780,794 C1                                      Page 1 of 1
APPLICATION NO.  : 90/009951
DATED                  : August 24, 2010
INVENTOR(S)       : Bobby E. Rogers et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Claims:

At column 2, line number 4, claim number 12 should read --removing [the] *a* seal [from] *that encloses* [the] *an* opening--

Signed and Sealed this
Nineteenth Day of March, 2013

Teresa Stanek Rea
*Acting Director of the United States Patent and Trademark Office*

**A00036**



US007780794C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (9104th)

# United States Patent
Rogers et al.

(10) **Number:**       **US 7,780,794 C1**

(45) **Certificate Issued:**       **Jun. 26, 2012**

(54) **MEDICAL IMPLEMENT CLEANING DEVICE**

(75) Inventors: **Bobby E. Rogers**, San Diego, CA (US);
       **Paul DiPerna**, San Clemente, CA (US)

(73) Assignee: **Ivera Medical Corporation**, San Diego,
       CA (US)

**Reexamination Request:**
    No. 90/009,951, Oct. 3, 2011

**Reexamination Certificate for:**
    Patent No.:    **7,780,794**
    Issued:    **Aug. 24, 2010**
    Appl. No.:    **11/705,805**
    Filed:    **Feb. 12, 2007**

### Related U.S. Application Data

(60) Provisional application No. 60/850,438, filed on Oct. 10, 2006, and provisional application No. 60/832,437, filed on Jul. 21, 2006.

(51) **Int. Cl.**
    *B08B 17/14*    (2006.01)
    *A61M 39/16*    (2006.01)

(52) **U.S. Cl.** ............................. **134/6**; 15/97.1; 604/533

(58) **Field of Classification Search** ........................ None
       See application file for complete search history.

(56)    **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/009,951, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner*—Terrence Till

(57)    **ABSTRACT**

A cleaning device for a medical implement is disclosed. The cleaning device includes a cap having an opening to an inner cavity, the opening being adapted to receive a site of the medical implement. The cleaning device further includes a compressible cleaning material that contains a cleaning agent prior to receipt of the site of the medical implement, i.e. the cleaning material is pre-loaded with the cleaning agent. The compressible cleaning material is at least partially secured in the inner cavity and adapted to swab and clean the site with the cleaning agent.



US 7,780,794 C1

**1**

## EX PARTE
## REEXAMINATION CERTIFICATE
## ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1-11** and **13-24** is confirmed.

Claim **12** is determined to be patentable as amended.

**12**. A method of cleaning a site of a medical implement,
the method comprising:

[at least partially saturating a cleaning material with a
cleaning agent in an inner cavity of a cap that includes
an opening to the inner cavity and at least one other

**2**

aperture to the inner cavity the cap further including a
removable seal that encloses the opening and the at
least one other aperture;]

removing [the] *a* seal from *that encloses* [the] *an* opening
and [the] *at* least one other aperture *to an inner cavity of
a cap;*

*exposing a cleaning material in the inner cavity of the
cap, the cleaning material being at least partially satu-
rated with a cleaning agent prior to removing the seal;*

contacting a top of the site of the medical implement to a
first portion of the cleaning material;

compressing the first portion of cleaning material with the
site of the medical implement to contact the site with
the cleaning agent in the cleaning material [provided
around the first cleaning material];

attaching the cap over the top of the site of the medical
implement; and

[evaporating] *venting* the cleaning agent through the at
least one other aperture to the inner cavity as the cap is
attached over the top of the site.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,780,794 C1                                    Page 1 of 1
APPLICATION NO.   : 90/009951
DATED             : August 24, 2010
INVENTOR(S)       : Bobby E. Rogers et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

        In the Claims:

        At column 2, line number 4, claim number 12 should read --removing [the] *a* seal [from] *that encloses* [the] *an* opening--

Signed and Sealed this
Nineteenth Day of March, 2013

Teresa Stanek Rea
*Acting Director of the United States Patent and Trademark Office*

**A00039**

US007985302B2

**(12) United States Patent**
Rogers et al.

(10) **Patent No.:** US 7,985,302 B2
(45) **Date of Patent:** Jul. 26, 2011

(54) **MEDICAL IMPLEMENT CLEANING DEVICE**

(75) Inventors: **Bobby E. Rogers**, San Diego, CA (US);
**Paul Diperna**, San Diego, CA (US)

(73) Assignee: **Ivera Medical Corporation**, San Diego,
CA (US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/860,825**

(22) Filed: **Aug. 20, 2010**

(65) **Prior Publication Data**

US 2010/0313366 A1    Dec. 16, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 11/705,805, filed on
Feb. 12, 2007, now Pat. No. 7,780,794.

(60) Provisional application No. 60/832,437, filed on Jul.
21, 2006, provisional application No. 60/850,438,
filed on Oct. 10, 2006.

(51) **Int. Cl.**
*B08B 3/04*     (2006.01)
*B08B 11/00*    (2006.01)
*B08B 1/00*     (2006.01)

(52) **U.S. Cl.** .................. 134/115 R; 15/97.1; 15/104.92;
15/104.93; 604/267; 604/533

(58) **Field of Classification Search** .......... 134/6, 115 R;
15/97.1, 104.92, 104.93; 604/267, 533
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2006/0030827 A1 *  2/2006  Raulerson et al. ........... 604/267
2007/0112333 A1 *  5/2007  Hoang et al. .................. 604/533

* cited by examiner

*Primary Examiner* — Michael Kornakov
*Assistant Examiner* — Natasha Campbell
(74) *Attorney, Agent, or Firm* — Mintz Levin, Cohn, Ferris,
Glovsky, and Popeo P.C.

(57)                 **ABSTRACT**

A cleaning device for a medical implement is disclosed. The
cleaning device includes a cap having an opening to an inner
cavity, the opening being adapted to receive a site of the
medical implement. The cleaning device further includes a
compressible cleaning material that contains a cleaning agent
prior to receipt of the site of the medical implement, i.e. the
cleaning material is pre-loaded with the cleaning agent. The
compressible cleaning material is at least partially secured in
the inner cavity and adapted to swab and clean the site with
the cleaning agent.

**17 Claims, 7 Drawing Sheets**





FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8

A00044



FIG. 9



FIG. 10



FIG. 11



FIG. 12



FIG. 13

FIG. 14

A00047

US 7,985,302 B2

1

# MEDICAL IMPLEMENT CLEANING DEVICE

## CROSS REFERENCE TO RELATED APPLICATIONS

The application is a continuation of U.S. application Ser. No. 11/705,805 filed Feb. 12, 2007 and entitled "MEDICAL IMPLEMENT CLEANING DEVICE" which claims priority under 35 U.S.C. §119 to U.S. Provisional Patent Application Ser. No. 60/832,437 filed on Jul. 21, 2006 entitled "DISIN-FECTING CAP" and to U.S. Provisional Patent Application Ser. No. 60/850,438 filed on Oct. 10, 2006, entitled "DISIN-FECTING CAP" the entire disclosures of which are incorporated by reference herein.

## BACKGROUND

Within the medical field, and in particular the area of infusion of fluids or aspiration of fluids to or from a patient, there is a need to prevent the transmission of pathogens into or onto a patient from a potentially contaminated surface of a medical implement, or "site". Such pathogens include microorganisms such as bacteria and viruses. The transmission of pathogens into a patient may result in an infection that could be life threatening. Specific to healthcare settings, the term "noso-comial infection" describes those infections that originate from or occur in a hospital or hospital-like setting. In the U.S., nosocomial infections are estimated to occur in at least 5% of all acute care hospitalizations. The estimated incidence is more than two million cases per year, resulting in an added expenditure in excess of $4.5 billion. Nosocomial infections are estimated to more than double the mortality and morbidity risks of any admitted patient, and likely result in about 90,000 deaths a year in the United States. Common sites for such transmissions are found on such medical implements as a luer port, vial, needle free valve, or an injection port of a vessel, tubing, or catheter. Even non-intrusive medical implements such as stethoscopes can transmit pathogens to a patient. The incidence of infection in patients is presently numerous and increasing, and Infection Control Practitioners (ICP's) often cite improper cleaning of sites as a major source of these infections.

Traditionally, cleaning a potentially contaminated surface includes a protocol of alcohol swabbing prior to making the necessary connections to the site. Today alcohol swabs, a small pad of cotton gauze soaked in isopropyl alcohol, are packed individually in a foil package. The foil package is relatively inexpensive, and is used to retain the alcohol within the package and to prevent evaporation. Properly used, the package is opened at or near the site to be swabbed. With gloved hands, the pad is removed by a healthcare provider and wiped across the top and side surfaces of the site, and the pad and foil package are discarded. The site should be allowed to dry, usually twenty to thirty seconds, immediately prior to making any connection. This "drying" period is important: when alcohol dries, it breaks open the cellular walls of micro-organisms, thereby killing them.

Unfortunately, because of increased duties and responsibilities, shrinking nursing staffs, and inadequate training, swabbing is often overlooked or is poorly executed. A poorly swabbed site can carry microorganisms that, if allowed to enter a patient's body, can cause serious infection. In addition, supervisory oversight is nearly impossible, because unless a supervisor can actually observe the swabbing being performed, the supervisor cannot know whether or not it was done properly or performed at all. Further, without at least a sufficient microscopic examination for microbial residue,

2

there may be no evidence of an alcohol swab being performed. Thus, a need exists for an apparatus and technique for cleaning a site on a medical implement prior to contact with a patient, and which will eliminate technique-related issues and training issues, and provide an unequivocal indicator that a site is clean prior to accessing a patient's vascular system.

## SUMMARY

A cleaning device, system and method for a medical environment is disclosed. In one aspect, the cleaning device includes a cap having an opening to an inner cavity, the opening being adapted to receive a site of the medical implement. The cleaning device further includes a compressible cleaning material that contains a cleaning agent prior to receipt of the site of the medical implement, i.e. the cleaning material is pre-loaded with the cleaning agent. The compressible cleaning material is at least partially secured in the inner cavity and adapted to swab and clean the site with the cleaning agent.

In another aspect, a cleaning system for a threaded medical implement includes a cap having an inner cavity and an opening to receive a site of the medical implement into the inner cavity. The system further includes a threaded ring connected to the inner cavity at the opening to the cap, and having threads that correspond to threads on the threaded medical implement. The system further includes a cleaning material in the inner cavity adapted to provide radial compression against the threaded medical implement, the cleaning material containing a cleaning agent prior to receipt of the site of the medical implement. The opening is preferably covered by a removable vacuum seal.

In yet another aspect, a method of cleaning a site of a medical implement includes the steps of at least partially saturating a cleaning material with a cleaning agent in an inner cavity of a cap; and contacting a top of the site of the medical implement to a first portion of the cleaning material. The method further includes steps of compressing the first portion of cleaning material with the site of the medical implement to contact a side of the site with a second portion of the cleaning material provided around the first cleaning material, and attaching the cap over the site of the medical implement.

In yet another aspect, a cleaning device for a medical implement includes a cap having an opening to an inner cavity, an inner surface of the opening including one or more threads adapted to receive a site of the medical implement. The cleaning device further includes a cleaning material formed of a compressible material that is at least partially secured in the inner cavity, the cleaning material containing a cleaning agent.

In still yet another aspect, a cleaning system for a medical environment includes a plurality of caps. Each cap includes an inner cavity and an opening to receive a site of the medical implement into the inner cavity, and a cleaning material in the inner cavity adapted to provide radial compression against a site of a medical implement, the cleaning material containing a cleaning agent prior to receipt of the site of the medical implement. The system further includes a seal that covers the opening of each of the plurality of caps, and from which individual ones of the plurality of caps can be selectively removed to be used for cleaning the site of the medical implement.

The details of one or more embodiments are set forth in the accompanying drawings and the description below. Other

**A00048**

US 7,985,302 B2

3

features and advantages will be apparent from the description and drawings, and from the claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other aspects will now be described in detail with reference to the following drawings.

FIG. **1** is a cross-sectional, exploded view of a cleaning device.

FIG. **2** is a cross-sectional view of an assembled cleaning device.

FIG. **3** illustrates operation of a cleaning device for connection to a site of a medical implement.

FIG. **4** illustrates a cleaning device connected to a medical implement and cleaning a site of the medical implement.

FIG. **5** shows another embodiment of an assembled cleaning device.

FIG. **6** is a cross-sectional view of an assembled cleaning device in accordance with an embodiment.

FIG. **7** is a perspective view of another cleaning device.

FIG. **8** is a cross section of a cleaning device.

FIGS. **9** and **10** show a cleaning device being used to clean a site of a medical implement.

FIG. **11** is a perspective view of a ring that attaches to a corresponding structure of a medical implement.

FIG. **12** is a cross sectional view of another alternative embodiment of a cleaning device.

FIG. **13** shows yet another alternative embodiment of a cleaning device.

FIG. **14** shows a cap of a cleaning device in accordance with some embodiments.

Like reference symbols in the various drawings indicate like elements.

## DETAILED DESCRIPTION

In accordance with preferred embodiments, a cleaning device includes a cap having a shape and/or external features to promote easy gripping and a cleaning material in the cap that holds or is in contact with a cleaning agent, such as isopropyl alcohol, for application of the cleaning agent to a site of a medical implement.

The cleaning material can be any substance that can conform, mold or compress in a manner that enables the effective wiping of the site, including the top surface of the site, side surface, and any threads or grooves, if present, and provide the cleaning agent at least at a surface level. Examples of the cleaning material include cotton, open or closed cell foam such as polyethylene foam, or other substance that can hold or carry the cleaning agent. The cleaning agent can be any chemical, substance or material that cleans the site of bacterial or even viral microorganisms, or any carrier that contains such chemical, substance or material. Examples of a cleaning agent include isopropyl alcohol, chlorhexidine, povidone-iodine, hydrogen peroxide, soap, and hydrochloric acid.

The term "medical implement" is used to denote any tool or object that can be used in a medical setting and that can connect to a site cleaning device as described herein according to a number of embodiments. Examples of medical implements include, but are not limited to, access ports on tubing sets (extension sets, T-connectors and IV sets), access ports on catheters (both peripheral and central lines), needle free valves, stopcocks, luer connectors, stethoscopes and other components or devices whereby regular cleaning is desired. Medical implements are commercially available in standard

4

sizes. Thus, the end or opening of a site cleaning device can be provided with fittings to accommodate such standard size medical implements.

The cap of the cleaning device is made of a material that is compatible with the cleaning materials and agents to be used, examples of materials would include, sealed foam, plastic, glass, or metal. The cleaning device may need to undergo sterilization. For securing the cleaning device to another device, the cleaning device can include attachment mechanisms such as "snap-fit" mechanisms or clamps to hold it in place on the other device. Alternatively the cleaning material in the cap may conform to the sides of the medical implement to thereby "grip" and remain secured to the medical implement. The cap also may have threading to secure it in place on a medical implement. The cap may have some cutaway portions on its walls to enable the use of some undercuts during the molding process, and to allow the cleaning material to flex outward both during use. The cap can be made from polyethylene or another material that is stable when in the presence of alcohol or other cleaning agent.

In preferred exemplary embodiments, prior to being applied to a site, and after the cleaning material is provided with a cleaning agent, the opening of the cap is sealed with a foil-based seal or other material suitable for retaining a cleaning agent in the cleaning material and preventing evaporation of the cleaning agent. The cap seal may also be formed in a manner whereby several caps could be attached i.e. a strip, where individual caps can be peeled from the strip in order to be used. These strips of caps can be made conveniently accessible, i.e. hung from intravenous (IV) poles or IV sets, in patient rooms and medication carts, to name just a few. The strips provide the convenience of having several caps available in one location.

The cleaning material in the cap can be an alcohol-soaked piece of gauze, foam or similar cleaning material. The cleaning material can be formed into the general interior shape of the cap from one or more pieces. For instance, the cleaning material can include a ring for circumscriptive coverage and cleaning of the site, and further include a cylinder within the ring for coverage and cleaning on a distal end of the site. A single piece of cleaning material may also be cut or formed to perform the same coverage and cleaning functions as the two pieces described above. The cleaning material may also cover the threads and/or be formed as part of the threads.

In still further embodiments, the cleaning material may be made entirely or partially of the cleaning agent. For example, the cleaning material can be formed of an open cell foam or plastic that is chemically or physically impregnated with a cleaning agent such as povidone or iodine, or isopropyl alcohol.

To further illustrate and describe these concepts, reference is now made to FIG. **1**, which shows a cross-sectional, exploded view of a cleaning device, embodied as a cap **10** with a housing **4** that defines an inner cavity **20** of the cap **10**. A foil seal **1** is configured to attach to a sealing surface **2** of the housing **4**. The housing **4** further includes internal threads **3**. In a preferred exemplary embodiment, the internal threads **3** are sized and arranged to accommodate Luer threads, i.e. standardized male threads designed to mate with the female threads on a medical implement to which the cap **10** attaches. The housing **4** also has a mating surface **5** for attachment of a bottom portion **6**.

Within housing **4** is a first cleaning material **7**. The first cleaning material **7** may be attached to the walls of housing **4** by glue, solvent or some other attachment composition or mechanism, or may be held in the housing **4** by compression or trapped between the bottom portion **6** and housing **4**. Ribs

US 7,985,302 B2

5

or protrusions on the inside of the housing 4 may also be used to prevent the cleaning material 7 from slipping or rotating. The first cleaning material 7 is compressible, and is preferably doughnut-shaped or ring-shaped. The first cleaning material 7 is positioned and configured to compress radially in an outwardly direction to scrub or wipe the circumscriptive surface of the site and the surface of the threads of an inserted medical implement.

A second cleaning material 8 is designed to compress in the axial direction upon insertion of the medical implement and is designed to wipe the distal end and distal surface of the inserted medical implement. The second cleaning material 8 may be attached to the walls of bottom portion 6 by glue, solvent or some other attachment composition or mechanism, or affixed to first material 7 by glue, solvent or some other attachment composition or mechanism. Protrusions on the inside of the bottom portion 6 may also be used to prevent the cleaning material 8 from rotating or removal. The first cleaning material 7 and second cleaning material 8 may be formed from a single piece of compressible cleaning material of cotton, foam or other suitable cleaning material adapted for scrubbing. This single piece can be cut completely or partially cut to achieve a similar effect as two separate pieces of cleaning material.

FIG. 2 illustrates an assembled cap 10. The first and second cleaning materials 7 and 8 in the inner cavity 20 are at least partially saturated with a cleaning agent, such as isopropyl alcohol, or a mix of cleaning agents. The foil seal 1 is then attached to housing 4 at sealing surface 2 by glue, solvent, thermal bonding, etc. A bottom portion 6 is attached to housing 4 at point 5 by glue, welding, solvent, threads or other attachment mechanism or process. With the foil seal 1 and the bottom portion 6 attached to housing 4, the inner cavity 20 is hermetically sealed. The housing 4, bottom portion 6, and first and second cleaning materials 7, 8 are respectively made of a material or cleaning materials that are compatible with the cleaning agent. For instance, if isopropyl alcohol is used for at least part of the cleaning agent, the housing 4 and bottom portion 6 can be constructed of a plastic such as polyethylene. The housing 4 and bottom portion 6 can be formed of a unitary piece of material, as explained further below.

FIG. 3 illustrates a medical implement 30 moving toward housing 4, in a direction A, which should be recognized as a reference only, and that the housing 4 can likewise be moved toward the medical implement 30. The foil seal 1 is removed from housing 4. In alternative embodiments, the foil seal 1 can be a foil pouch or other sterilized material that would inhibit evaporation of the cleaning agent. A distal end surface 12 of the medical implement 30 is eventually contacted with the upper surface 50 of the second cleaning material 8.

As the medical implement 30 continues in direction A, it axially compresses second cleaning material 8 continuing to clean surface 12 with surface 50. This movement also begins to radially compress the first cleaning material 7 and to conform the first cleaning material 7 with, and begin scrubbing, threads 11. The cleaning materials 7 and 8 contain the cleaning agent so as to perform a thorough cleaning of the area about the threads 11 and the surface 12. As threads 11 of the medical implement 30 continue to be rotationally inserted into the threads 3 of the housing, the distal end surface 12 is automatically scrubbed by surface 50 of the second cleaning material 8 and cleaned by cleaning agent held therein, and at least a portion of the side and threads 11 of the medical implement 30 are automatically scrubbed by radial compression of the first cleaning material 7 and cleaned by a cleaning

6

agent held therein. FIG. 4 illustrates the disinfecting cap 10 with a fully inserted medical implement 30.

The cap 10 can be removed immediately from the medical implement 30 after use, or be kept in place. If the cap 10 is removed the medical implement 30 surfaces 11 and 12 will be clean and ready for use upon the drying of the cleaning agent. If the cap 10 is kept secured to medical implement 30, the cleaning agent in cap 10 will evaporate over time thereby destroying any microorganisms on the surfaces 12 and 11 of medical implement 30. The cap 10 then maintains the surfaces 11 and 12 of medical implement 30 in a clean and ready-to-access state by eliminating any forms of touch contamination.

FIGS. 5-10 illustrate an alternate embodiment of a cleaning device 100. FIG. 5 is a perspective view of the cleaning device 100 formed of a cap 102 with a seal 104 that is connected to and covers the opening of the cap 102. The cap 102 can have a number of gripping ridges or projecting members for ease of use. FIG. 6 is a cross-sectional view of the cleaning device 100. The cap 102 forms an inner cavity with one opening that is large enough to receive a site of a medical implement. The seal 104 is affixed to the opening and is preferably entirely removable. In other embodiments, the seal 104 is permanently affixed, and is simply punctured by insertion of a site of a medical implement.

The cap 102 houses a threaded ring 106 proximate to the opening. The threaded ring 106 includes one or more threads 105 and is adapted to receive the site of the medical implement to be disinfected, and thus defines the size and shape of the opening. This embodiment is advantageous because it creates a single circumferential seal point, seal 104 to the opening of cap 102.

In some embodiments, the cap 102 and threaded ring 106 are formed of a unitary piece of material or cleaning material. In other embodiments, the threaded ring 106 fits into a groove 109 that is formed in the inside edge surface of the cap 102 near the opening. In this latter configuration, the groove 109 maintains the position of threaded ring 106 near the open end of the cap where the threaded ring top surface may be flush with or slightly recessed from the cap open end walls, and the threaded ring 106 may also include or create with the cap wall a small vent aperture or opening to allow evaporation of a cleaning agent in the cap 102. The threaded ring 106 can be mechanically kept from rotating with internal ribs or protrusions in cap 102 or groove 109. Threaded ring 106 may be held in place within grove 109 and cap 102 by glue, welding, snap-fit, solvent bonding or any other mechanism or composition known to those of requisite skill.

The cleaning device 100 further includes a first cleaning material 107 that holds the cleaning agent, such as isopropyl alcohol, and a second cleaning material 108 that also holds or is at least partially saturated by the cleaning agent. In preferred exemplary embodiments, the first cleaning material 107 is formed as a hollow cylinder or ring positioned between the threaded ring 106 and the top inside surface of the cap 102, and is adapted for radial compression against a site that is inserted into the cap 102 or over which the cap 102 is placed. In some embodiments, the second cleaning material 108 is formed as a solid cylinder and positioned within the hollow space of the first cleaning material 107, and is adapted for axial compression against a leading edge of the site that is inserted into the cap 102 or over which the cap 102 is placed. In other embodiments, cleaning materials 107 and 108 can be made of a single piece of material and cut or formed so as to achieve the same result as described above. The cleaning agent is provided to the cleaning materials 107, 108 prior to the opening being covered with the seal 104.

7

FIG. **7** is a bottom perspective view and FIG. **8** is a cross-sectional view of the cleaning device **100** with the seal **104** removed, showing the cap **102**, threaded ring **106** that sits within the cap **102** , and the second cleaning material **108** inside the cap **102**. The second cleaning material **108** can extend to and slightly beyond the opening of the cap **102**. FIG. **8** further shows the first cleaning material **107** that circumscribes the second cleaning material **108** and being positioned between the threaded ring **106** and the top inner surface of the cap **102**. FIG. **11** illustrates an example of the threaded ring **106** and its threads **105**. An attribute of this embodiment of the threaded ring **106** shown in FIG. **11** is that there are only two opposing threads that travel **180** degrees before terminating. This enables the molding of threaded ring **106** without the use of a screw to create the thread feature in an injection molding tool. The threaded ring **106** can also be produced with an injection molding tool utilizing a screw.

FIG. **9** illustrates the cleaning device **100** about to make contact with a site **120** of a medical implement. As discussed above, the site **120** can be a luer port, a, a needle free valve, an injection port of a vessel, or other medical implement that needs to be cleaned prior to use with a patient. In some embodiments, the site **120** can include a set of threads **122** that correspond to the threads **105** in the threaded ring **106** of the cleaning device **100**. The cleaning materials **107** and **108** are preloaded with a cleaning agent, before removal of the seal and contact by the site **120**. Accordingly, as shown in FIG. **10**, the site **120** makes contact with the cap **102** by a screwing motion relative to the cap **102**. The second cleaning material **108** is compressed axially and swabs against the leading edge of the site **120**, while the first cleaning material **107** is compressed radially and swabs against sides of the site **120**.

FIG. **11** illustrates the molded thread ring **106** with two opposing threads **105** that traverse opposing 180 degree portions of the ring. This design enables the thread ring **106** to be molded without the use of a screw that is typically used to create threaded parts in a molding process. Thus the threaded ring **106** can be manufacture very inexpensively. The threaded ring **106** can also clean some of the threads when the cap is placed into position, and may or may not cover all the threads. In some embodiments, the threaded ring **106** can be molded from the cleaning material, or the cleaning material is formed only of the threaded ring **106**. In such embodiments, the cleaning may only occur on threads of the site and in an axial direction.

FIG. **12** shows an alternative embodiment of a cleaning device **130** having a cap **132** that is filled with a cleaning material. The cap **132** has side walls **134** and a top **136** that define an inner cavity with an opening **132**. The cleaning material includes at least a first cleaning material **138**, such as cotton or foam, that delivers a cleaning agent. The cleaning material can include a second cleaning material **140** to hold more cleaning agent. In some embodiments, the second cleaning material **140** can be circumscribed by the first cleaning material **138**. Alternatively, the first cleaning material **138** can completely envelope the second cleaning material **140**, each providing their own compressibility and capacity to hold a cleaning agent. Still, in other embodiments, the first and second cleaning materials **138**, **140** can be formed of a single piece of material. The cleaning material(s) are filled at least partially with a cleaning agent, prior to sealing of the opening **132** with a seal and closure of the inner cavity.

FIG. **13** shows an alternate embodiment of a cleaning device **150**. In this embodiment, the cleaning device **150** includes a housing **152** that is formed as a threaded cap. The inner surface of the housing **152** is covered, at least in part, by

8

a cleaning layer **154** that is bonded to the inner surface of the housing **152**. The cleaning layer **154** can be a cleaning material such as cotton, foam, or other porous and pliable material that suitably holds and/or delivers a cleaning agent such as isopropyl alcohol. The cleaning layer **154** is sized and positioned inside the housing **152** so as to be able to swab the top and a portion of the sides of a part of a medical implement that is inserted therein, or over which the housing **152** is placed. Accordingly, the cleaning layer **154** can have any thickness or compressibility.

FIG. **14** shows yet another alternative embodiment of a cleaning device **160**, illustrating an outer view of a rounded housing **162** for an expanded inner chamber to hold more cleaning agents or cleaning materials that hold such agents. Holes **164** in the housing **162** can promote evaporation of the cleaning agent, particularly when the housing covers a site of a medical implement to be disinfected. The location of the vent holes is variable and the vent holes can also be sealed with a filter type membrane that permits the drying of the cleaning agents but does not allow entry of microorganisms or fluid.

The use of the various implementations and embodiments above entails the following: the healthcare worker would, with gloved hands, open the foil package and place this cap over the site of a medical implement to be cleaned. Upon placement the alcohol soaked cleaning material wipes all of the port's surfaces. This wipe could be accomplished by either a turning motion (if threads are used) or by simply pushing the cap onto the port. In this way the cap eliminates errors in the practice of swabbing due to poor training or excessive workloads. The cap would then remain secured in place by threads, mechanical tension provided by the foam, cotton, etc., snaps or some other mechanism. A cap in place on a medical implement is a positive indication that a desired site of the medical implement is clean. A vibrant color may be used to allow instant visualization of a cap's presence from a door or hallway. ICP's can review compliance by merely observing sites to see whether or not a cap is in place. The cap could remain in place for periods of up to three days or more. For extended periods the alcohol will likely evaporate, which assures that the site is clean. With the cap in place, it continues to keep the site clean even after the alcohol has evaporated.

Although a few embodiments have been described in detail above, other modifications are possible. For instance, any of the embodiments described above may be sized and scaled for a particular medical implement, such as a stethoscope. Other embodiments may be within the scope of the following claims.

The invention claimed is:

**1**. A cleaning device for a medical implement, the cleaning device comprising:

a cap having an opening to an inner cavity, the opening for receiving a site of the medical implement;

threading at least partially around an inside surface of the cap near a periphery of the opening to the inner cavity, the threading to engage corresponding threads on the site of the medical implement;

a compressible cleaning material in the inner cavity and containing a cleaning agent, the compressible cleaning material adapted to swab and clean the site with the cleaning agent;

at least one aperture to the inner cavity to allow venting from the inner cavity when the opening receives the site of the medical implement; and

a removable seal attached to the cap at the opening to cover the opening and to maintain the compressible cleaning

US 7,985,302 B2

9

material and cleaning agent within the inner cavity prior to receipt of the site of the medical implement.

**2**. The cleaning device in accordance with claim **1**, wherein the at least one aperture is transiently formed during receiving the site of the medical implement.

**3**. The cleaning device in accordance with claim **1**, wherein the venting from the inner cavity includes venting of at least a portion of the cleaning agent.

**4**. The cleaning device in accordance with claim **1**, wherein the venting from the inner cavity includes releasing pressure from the inner cavity.

**5**. The cleaning device in accordance with claim **1**, wherein when the site of the medical implement is received into the opening, at least some of the corresponding threads on the site of the medical implement are exposed to the cleaning agent.

**6**. The cleaning device in accordance with claim **1**, wherein when the site of the medical implement is received into the opening, at least some of the corresponding threads on the site of the medical implement extend beyond the threading and into the inner cavity.

**7**. A cleaning device for a medical implement, the cleaning device comprising:

a cap having an inner cavity for receiving a site of the medical implement;

threading at least partially around an inside surface of the cap near an outer periphery of the inner cavity, the threading to engage corresponding threads on the site of the medical implement;

a compressible cleaning material in the inner cavity and containing a cleaning agent, the compressible cleaning material adapted to swab and clean the site with the cleaning agent;

at least one aperture to the inner cavity to allow venting from the inner cavity when the inner cavity receives the site of the medical implement; and

a removable seal attached to the cap enclosing the inner cavity to seal the at least one aperture and to maintain the compressible cleaning material in the inner cavity.

**8**. The cleaning device in accordance with claim **7**, wherein the at least one aperture is transiently formed when the inner cavity receives the site of the medical implement.

**9**. The cleaning device in accordance with claim **7**, wherein the venting from the inner cavity includes venting of at least a portion of the cleaning agent.

**10**. The cleaning device in accordance with claim **7**, wherein the venting from the inner cavity includes releasing pressure from the inner cavity.

10

**11**. The cleaning device in accordance with claim **7**, wherein when the inner cavity receives the site of the medical implement, at least some of the corresponding threads on the site of the medical implement are exposed to the cleaning agent.

**12**. The cleaning device in accordance with claim **7**, wherein when the inner cavity receives the site of the medical implement, at least some of the corresponding threads on the site of the medical implement extend beyond the threading and into the inner cavity.

**13**. A cleaning device for a medical implement, the cleaning device comprising:

a cap for covering a site of the medical implement;

a compressible cleaning material in an inner cavity of the cap, the cleaning material being adapted to swab and clean the site with a cleaning agent when the cap covers the site of the medical implement;

threading at least partially around an inside surface of the cap near an outer periphery of the inner cavity, the threading to engage corresponding threads on the site of the medical implement;

at least one aperture to the inner cavity to allow venting from the inner cavity when the cap covers the site of the medical implement; and

a seal attached to the cap enclosing the inner cavity to seal the at least one aperture and to maintain the compressible cleaning material in the inner cavity, the seal being removable prior to the cap covering the site of the medical implement.

**14**. The cleaning device in accordance with claim **13**, wherein the at least one aperture is transiently formed when the cap covers the site of the medical implement.

**15**. The cleaning device in accordance with claim **13**, wherein the venting from the inner cavity includes venting of at least a portion of the cleaning agent.

**16**. The cleaning device in accordance with claim **13**, wherein the venting from the inner cavity includes releasing pressure from the inner cavity.

**17**. The cleaning device in accordance with claim **13**, wherein when the cap covers the site of the medical implement, at least some of the corresponding threads on the site of the medical implement extend beyond the threading and into the inner cavity and are exposed to the cleaning agent.

*    *    *    *    *



US007985302C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (9029th)

# United States Patent
Rogers et al.

(10) **Number:**        **US 7,985,302 C1**
(45) **Certificate Issued:**        **May 22, 2012**

---

(54) **MEDICAL IMPLEMENT CLEANING DEVICE**

(75) Inventors: **Bobby E. Rogers**, San Diego, CA (US); **Paul Diperna**, San Diego, CA (US)

(73) Assignee: **Ivera Medical Corporation**, San Diego, CA (US)

**Reexamination Request:**
No. 90/009,950, Oct. 3, 2011

**Reexamination Certificate for:**
Patent No.:     **7,985,302**
Issued:         **Jul. 26, 2011**
Appl. No.:      **12/860,825**
Filed:          **Aug. 20, 2010**

**Related U.S. Application Data**

(63) Continuation of application No. 11/705,805, filed on Feb. 12, 2007, now Pat. No. 7,780,794.

(60) Provisional application No. 60/832,437, filed on Jul. 21, 2006, and provisional application No. 60/850,438, filed on Oct. 10, 2006.

(51) **Int. Cl.**
**B08B 3/04**      (2006.01)
**B08B 1/00**      (2006.01)
**B08B 11/00**     (2006.01)

(52) **U.S. Cl.** ................. 134/115 R; 15/97.1; 15/104.92; 15/104.93; 604/267; 604/533

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56)             **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/009,950, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner*—Terrence Till

(57)             **ABSTRACT**

A cleaning device for a medical implement is disclosed. The cleaning device includes a cap having an opening to an inner cavity, the opening being adapted to receive a site of the medical implement. The cleaning device further includes a compressible cleaning material that contains a cleaning agent prior to receipt of the site of the medical implement, i.e. the cleaning material is pre-loaded with the cleaning agent. The compressible cleaning material is at least partially secured in the inner cavity and adapted to swab and clean the site with the cleaning agent.



US 7,985,302 C1

1

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1-6, 13-17** is confirmed.

Claim **7** is determined to be patentable as amended.

Claims **8-12** dependent on an amended claim, are determined to be patentable.

New claims **18-25** are added and determined to be patentable.

**7**. A cleaning device for a medical implement, the cleaning device comprising:

a cap having an inner cavity for receiving a site of the medical implement;

threading at least partially around an inside surface of the cap near an outer periphery of the inner cavity, the threading to engage corresponding threads on the site of the medical implement;

a compressible cleaning material in the inner cavity [and containing] *at least partially preloaded with* a cleaning agent *prior to receiving the site of the medical implement*, the compressible cleaning material adapted to swab and clean the site with the cleaning agent;

at least one aperture to the inner cavity to allow venting from the inner cavity when the inner cavity receives the site of the medical implement; and

a removable seal attached to the cap enclosing the inner cavity to seal the at least one aperture and to maintain the compressible cleaning material *at least partially preloaded with the cleaning agent* in the inner cavity.

2

18. A cleaning device for a medical implement, the cleaning device comprising:

a cap having an opening to an inner cavity for receiving the medical implement;

at least one aperture to the inner cavity to allow venting from the inner cavity when the opening receives the medical implement;

threading at least partially around an inside surface of the cap to engage the site of the medical implement;

a compressible cleaning material in the inner cavity, the compressible cleaning material being preloaded with a cleaning agent prior to the inner cavity receiving the medical implement, the compressible cleaning material being positioned in the inner cavity for compression by a distal end surface of the medical implement; and

a removable seal covering the opening to the inner cavity and the at least one aperture, the removable seal being removed from the opening to receive the medical implement and to allow the compression of the compressible material by the distal end surface of the medical implement to clean a distal end surface of the medical implement with the cleaning material and the cleaning agent.

19. The cleaning device in accordance with claim 18, wherein the at least one aperture is transiently formed during receiving the site of the medical implement.

20. The cleaning device in accordance with claim 18, wherein the venting from the inner cavity includes venting of at least a portion of the cleaning agent.

21. The cleaning device in accordance with claim 18, wherein the venting from the inner cavity includes releasing pressure from the inner cavity.

22. The cleaning device in accordance with claim 18, wherein the at least one aperture is separate from the opening to the inner cavity.

23. The cleaning device in accordance with claim 1, wherein the at least one aperture is separate from the opening to the inner cavity.

24. The cleaning device in accordance with claim 7, wherein the at least one aperture is separate from an opening to the inner cavity.

25. The cleaning device in accordance with claim 13, wherein the at least one aperture is separate from an opening to the inner cavity.

\* \* \* \* \*

US008206514B2

## (12) United States Patent

Rogers et al.

(10) Patent No.: **US 8,206,514 B2**

(45) Date of Patent: *Jun. 26, 2012

(54) **MEDICAL IMPLEMENT CLEANING DEVICE**

(75) Inventors: **Bobby E. Rogers**, San Diego, CA (US); **Paul Diperna**, San Clemente, CA (US)

(73) Assignee: **Ivera Medical Corporation**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/189,457**

(22) Filed: **Jul. 22, 2011**

(65) **Prior Publication Data**

US 2011/0277788 A1    Nov. 17, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 12/860,825, filed on Aug. 20, 2010, now Pat. No. 7,985,302, which is a continuation of application No. 11/705,805, filed on Feb. 12, 2007, now Pat. No. 7,780,794.

(60) Provisional application No. 60/850,438, filed on Oct. 10, 2006, provisional application No. 60/832,437, filed on Jul. 21, 2006.

(51) **Int. Cl.**
  **B08B 3/04**      (2006.01)
  **B08B 11/00**    (2006.01)
  **B08B 1/00**      (2006.01)

(52) **U.S. Cl.** ..................... **134/115 R**; 134/201; 15/97.1; 15/104.92; 15/104.93; 604/267; 604/533

(58) **Field of Classification Search** .......... 134/6, 115 R; 15/97.1, 104.92, 104.93, 104.94; 604/267, 604/533

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,440,207 A | 4/1984 | Genatempo et al. | |
| 4,778,447 A | 10/1988 | Velde et al. | |
| 5,554,135 A | 9/1996 | Menyhay | |
| 5,954,957 A | 9/1999 | Chin-Loy et al. | |
| 7,922,701 B2 | 4/2011 | Buchman | |
| 2004/0258560 A1 | 12/2004 | Lake et al. | |
| 2005/0147524 A1 | 7/2005 | Bousquet | |
| 2007/0112333 A1 | 5/2007 | Hoang et al. | |

OTHER PUBLICATIONS

Image File History for Re-examination Control No. 90/009,950, Dated Feb. 24, 2012.
Image File History for Re-examination Control No. 90/009,951, Dated Feb. 24, 2012.

*Primary Examiner* — Michael Kornakov
*Assistant Examiner* — Natasha Campbell
(74) *Attorney, Agent, or Firm* — Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.

(57) **ABSTRACT**

A cleaning device for a medical implement is disclosed. The cleaning device includes a cap having an opening to an inner cavity, the opening being adapted to receive a site of the medical implement. The cleaning device further includes a compressible cleaning material that contains a cleaning agent prior to receipt of the site of the medical implement, i.e. the cleaning material is pre-loaded with the cleaning agent. The compressible cleaning material is at least partially secured in the inner cavity and adapted to swab and clean the site with the cleaning agent.

**37 Claims, 7 Drawing Sheets**





FIG. 1



FIG. 2



FIG. 3



FIG. 4

A00057



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10



FIG. 11



FIG. 12



FIG. 13



FIG. 14

US 8,206,514 B2

1

# MEDICAL IMPLEMENT CLEANING DEVICE

## PRIORITY

This application is a continuation of U.S. patent application Ser. No. 12/860,825 filed on Aug. 20, 2010, now U.S. Pat. No. 7,985,302, entitled "Medical Implement Cleaning Device," which is a continuation of U.S. patent application Ser. No. 11/705,805 filed on Feb. 12, 2007, issued on Aug. 24, 2010 as U.S. Pat. No. 7,780,794, and entitled "Medical Implement Cleaning Device," which claims the benefit under 35 U.S.C. §119(e) of U.S. provisional patent application Ser. No. 60/832,437 filed on Jul. 21, 2006 and entitled "Disinfecting Cap" and also claims the benefit under 35 U.S.C. §119(e) of U.S. Provisional patent application Ser. No. 60/850,438 filed on Oct. 10, 2006 and entitled "Disinfecting Cap." The disclosures of all applications to which the current application claims priority are incorporated by reference herein in their entireties.

## BACKGROUND

Within the medical field, and in particular the area of infusion of fluids or aspiration of fluids to or from a patient, there is a need to prevent the transmission of pathogens into or onto a patient from a potentially contaminated surface of a medical implement, or "site". Such pathogens include microorganisms such as bacteria and viruses. The transmission of pathogens into a patient may result in an infection that could be life threatening. Specific to healthcare settings, the term "nosocomial infection" describes those infections that originate from or occur in a hospital or hospital-like setting. In the U.S., nosocomial infections are estimated to occur in at least 5% of all acute care hospitalizations. The estimated incidence is more than two million cases per year, resulting in an added expenditure in excess of $4.5 billion. Nosocomial infections are estimated to more than double the mortality and morbidity risks of any admitted patient, and likely result in about 90,000 deaths a year in the United States. Common sites for such transmissions are found on such medical implements as a luer port, vial, needle free valve, or an injection port of a vessel, tubing, or catheter. Even non-intrusive medical implements such as stethoscopes can transmit pathogens to a patient. The incidence of infection in patients is presently numerous and increasing, and Infection Control Practitioners (ICP's) often cite improper cleaning of sites as a major source of these infections.

Traditionally, cleaning a potentially contaminated surface includes a protocol of alcohol swabbing prior to making the necessary connections to the site. Today alcohol swabs, a small pad of cotton gauze soaked in isopropyl alcohol, are packed individually in a foil package. The foil package is relatively inexpensive, and is used to retain the alcohol within the package and to prevent evaporation. Properly used, the package is opened at or near the site to be swabbed. With gloved hands, the pad is removed by a healthcare provider and wiped across the top and side surfaces of the site, and the pad and foil package are discarded. The site should be allowed to dry, usually twenty to thirty seconds, immediately prior to making any connection. This "drying" period is important: when alcohol dries, it breaks open the cellular walls of microorganisms, thereby killing them.

Unfortunately, because of increased duties and responsibilities, shrinking nursing staffs, and inadequate training, swabbing is often overlooked or is poorly executed. A poorly swabbed site can carry microorganisms that, if allowed to enter a patient's body, can cause serious infection. In addition, supervisory oversight is nearly impossible, because unless a supervisor can actually observe the swabbing being performed, the supervisor cannot know whether or not it was done properly or performed at all. Further, without at least a sufficient microscopic examination for microbial residue, there may be no evidence of an alcohol swab being performed. Thus, a need exists for an apparatus and technique for cleaning a site on a medical implement prior to contact with a patient, and which will eliminate technique-related issues and training issues, and provide an unequivocal indicator that a site is clean prior to accessing a patient's vascular system.

## SUMMARY

A cleaning device, system and method for a medical environment is disclosed. In one aspect, the cleaning device includes a cap having an opening to an inner cavity, the opening being adapted to receive a site of the medical implement. The cleaning device further includes a compressible cleaning material that contains a cleaning agent prior to receipt of the site of the medical implement, i.e. the cleaning material is pre-loaded with the cleaning agent. The compressible cleaning material is at least partially secured in the inner cavity and adapted to swab and clean the site with the cleaning agent.

In another aspect, a cleaning system for a threaded medical implement includes a cap having an inner cavity and an opening to receive a site of the medical implement into the inner cavity. The system further includes a threaded ring connected to the inner cavity at the opening to the cap, and having threads that correspond to threads on the threaded medical implement. The system further includes a cleaning material in the inner cavity adapted to provide radial compression against the threaded medical implement, the cleaning material containing a cleaning agent prior to receipt of the site of the medical implement. The opening is preferably covered by a removable vacuum seal.

In yet another aspect, a method of cleaning a site of a medical implement includes the steps of at least partially saturating a cleaning material with a cleaning agent in an inner cavity of a cap; and contacting a top of the site of the medical implement to a first portion of the cleaning material. The method further includes steps of compressing the first portion of cleaning material with the site of the medical implement to contact a side of the site with a second portion of the cleaning material provided around the first cleaning material, and attaching the cap over the site of the medical implement.

In yet another aspect, a cleaning device for a medical implement includes a cap having an opening to an inner cavity, an inner surface of the opening including one or more threads adapted to receive a site of the medical implement. The cleaning device further includes a cleaning material formed of a compressible material that is at least partially secured in the inner cavity, the cleaning material containing a cleaning agent.

In still yet another aspect, a cleaning system for a medical environment includes a plurality of caps. Each cap includes an inner cavity and an opening to receive a site of the medical implement into the inner cavity, and a cleaning material in the inner cavity adapted to provide radial compression against a site of a medical implement, the cleaning material containing a cleaning agent prior to receipt of the site of the medical implement. The system further includes a seal that covers the opening of each of the plurality of caps, and from which

US 8,206,514 B2

3

individual ones of the plurality of caps can be selectively removed to be used for cleaning the site of the medical implement.

The details of one or more embodiments are set forth in the accompanying drawings and the description below. Other features and advantages will be apparent from the description and drawings, and from the claims.

BRIEF DESCRIPTION OF THE DRAWINGS

These and other aspects will now be described in detail with reference to the following drawings.

FIG. **1** is a cross-sectional, exploded view of a cleaning device.

FIG. **2** is a cross-sectional view of an assembled cleaning device.

FIG. **3** illustrates operation of a cleaning device for connection to a site of a medical implement.

FIG. **4** illustrates a cleaning device connected to a medical implement and cleaning a site of the medical implement.

FIG. **5** shows another embodiment of an assembled cleaning device.

FIG. **6** is a cross-sectional view of an assembled cleaning device in accordance with an embodiment.

FIG. **7** is a perspective view of another cleaning device.

FIG. **8** is a cross section of a cleaning device.

FIGS. **9** and **10** show a cleaning device being used to clean a site of a medical implement.

FIG. **11** is a perspective view of a ring that attaches to a corresponding structure of a medical implement.

FIG. **12** is a cross sectional view of another alternative embodiment of a cleaning device.

FIG. **13** shows yet another alternative embodiment of a cleaning device.

FIG. **14** shows a cap of a cleaning device in accordance with some embodiments.

Like reference symbols in the various drawings indicate like elements.

DETAILED DESCRIPTION

In accordance with preferred embodiments, a cleaning device includes a cap having a shape and/or external features to promote easy gripping and a cleaning material in the cap that holds or is in contact with a cleaning agent, such as isopropyl alcohol, for application of the cleaning agent to a site of a medical implement.

The cleaning material can be any substance that can conform, mold or compress in a manner that enables the effective wiping of the site, including the top surface of the site, side surface, and any threads or grooves, if present, and provide the cleaning agent at least at a surface level. Examples of the cleaning material include cotton, open or closed cell foam such as polyethylene foam, or other substance that can hold or carry the cleaning agent. The cleaning agent can be any chemical, substance or material that cleans the site of bacterial or even viral microorganisms, or any carrier that contains such chemical, substance or material. Examples of a cleaning agent include isopropyl alcohol, chlorhexidine, povidone-iodine, hydrogen peroxide, soap, and hydrochloric acid.

The term "medical implement" is used to denote any tool or object that can be used in a medical setting and that can connect to a site cleaning device as described herein according to a number of embodiments. Examples of medical implements include, but are not limited to, access ports on tubing sets (extension sets, T-connectors and IV sets), access ports on catheters (both peripheral and central lines), needle free

4

valves, stopcocks, luer connectors, stethoscopes and other components or devices whereby regular cleaning is desired. Medical implements are commercially available in standard sizes. Thus, the end or opening of a site cleaning device can be provided with fittings to accommodate such standard size medical implements.

The cap of the cleaning device is made of a material that is compatible with the cleaning materials and agents to be used, examples of materials would include, sealed foam, plastic, glass, or metal. The cleaning device may need to undergo sterilization. For securing the cleaning device to another device, the cleaning device can include attachment mechanisms such as "snap-fit" mechanisms or clamps to hold it in place on the other device. Alternatively the cleaning material in the cap may conform to the sides of the medical implement to thereby "grip" and remain secured to the medical implement. The cap also may have threading to secure it in place on a medical implement. The cap may have some cutaway portions on its walls to enable the use of some undercuts during the molding process, and to allow the cleaning material to flex outward both during use. The cap can be made from polyethylene or another material that is stable when in the presence of alcohol or other cleaning agent.

In preferred exemplary embodiments, prior to being applied to a site, and after the cleaning material is provided with a cleaning agent, the opening of the cap is sealed with a foil-based seal or other material suitable for retaining a cleaning agent in the cleaning material and preventing evaporation of the cleaning agent. The cap seal may also be formed in a manner whereby several caps could be attached i.e. a strip, where individual caps can be peeled from the strip in order to be used. These strips of caps can be made conveniently accessible, i.e. hung from intravenous (IV) poles or IV sets, in patient rooms and medication carts, to name just a few. The strips provide the convenience of having several caps available in one location.

The cleaning material in the cap can be an alcohol-soaked piece of gauze, foam or similar cleaning material. The cleaning material can be formed into the general interior shape of the cap from one or more pieces. For instance, the cleaning material can include a ring for circumscriptive coverage and cleaning of the site, and further include a cylinder within the ring for coverage and cleaning on a distal end of the site. A single piece of cleaning material may also be cut or formed to perform the same coverage and cleaning functions as the two pieces described above. The cleaning material may also cover the threads and/or be formed as part of the threads.

In still further embodiments, the cleaning material may be made entirely or partially of the cleaning agent. For example, the cleaning material can be formed of an open cell foam or plastic that is chemically or physically impregnated with a cleaning agent such as povidone or iodine, or isopropyl alcohol.

To further illustrate and describe these concepts, reference is now made to FIG. **1**, which shows a cross-sectional, exploded view of a cleaning device, embodied as a cap **10** with a housing **4** that defines an inner cavity **20** of the cap **10**. A foil seal **1** is configured to attach to a sealing surface **2** of the housing **4**. The housing **4** further includes internal threads **3**. In a preferred exemplary embodiment, the internal threads **3** are sized and arranged to accommodate luer threads, i.e. standardized male threads designed to mate with the female threads on a medical implement to which the cap **10** attaches. The housing **4** also has a mating surface **5** for attachment of a bottom portion **6**.

Within housing **4** is a first cleaning material **7**. The first cleaning material **7** may be attached to the walls of housing **4**

US 8,206,514 B2

5

by glue, solvent or some other attachment composition or mechanism, or may be held in the housing 4 by compression or trapped between the bottom portion 6 and housing 4. Ribs or protrusions on the inside of the housing 4 may also be used to prevent the cleaning material 7 from slipping or rotating. The first cleaning material 7 is compressible, and is preferably doughnut-shaped or ring-shaped. The first cleaning material 7 is positioned and configured to compress radially in an outwardly direction to scrub or wipe the circumscriptive surface of the site and the surface of the threads of an inserted medical implement.

A second cleaning material 8 is designed to compress in the axial direction upon insertion of the medical implement and is designed to wipe the distal end and distal surface of the inserted medical implement. The second cleaning material 8 may be attached to the walls of bottom portion 6 by glue, solvent or some other attachment composition or mechanism, or affixed to first material 7 by glue, solvent or some other attachment composition or mechanism. Protrusions on the inside of the bottom portion 6 may also be used to prevent the cleaning material 8 from rotating or removal. The first cleaning material 7 and second cleaning material 8 may be formed from a single piece of compressible cleaning material of cotton, foam or other suitable cleaning material adapted for scrubbing. This single piece may be cut completely or partially cut to achieve a similar effect as two separate pieces of cleaning material.

FIG. 2 illustrates an assembled cap 10. The first and second cleaning materials 7 and 8 in the inner cavity 20 are at least partially saturated with a cleaning agent, such as isopropyl alcohol, or a mix of cleaning agents. The foil seal 1 is then attached to housing 4 at sealing surface 2 by glue, solvent, thermal bonding, etc. A bottom portion 6 is attached to housing 4 at point 5 by glue, welding, solvent, threads or other attachment mechanism or process. With the foil seal 1 and the bottom portion 6 attached to housing 4, the inner cavity 20 is hermetically sealed. The housing 4, bottom portion 6, and first and second cleaning materials 7, 8 are respectively made of a material or cleaning materials that are compatible with the cleaning agent. For instance, if isopropyl alcohol is used for at least part of the cleaning agent, the housing 4 and bottom portion 6 can be constructed of a plastic such as polyethylene. The housing 4 and bottom portion 6 can be formed of a unitary piece of material, as explained further below.

FIG. 3 illustrates a medical implement 30 moving toward housing 4, in a direction A, which should be recognized as a reference only, and that the housing 4 can likewise be moved toward the medical implement 30. The foil seal 1 is removed from housing 4. In alternative embodiments, the foil seal 1 can be a foil pouch or other sterilized material that would inhibit evaporation of the cleaning agent. A distal end surface 12 of the medical implement 30 is eventually contacted with the upper surface 50 of the second cleaning material 8.

As the medical implement 30 continues in direction A, it axially compresses second cleaning material 8 continuing to clean surface 12 with surface 50. This movement also begins to radially compress the first cleaning material 7 and to conform the first cleaning material 7 with, and begin scrubbing, threads 11. The cleaning materials 7 and 8 contain the cleaning agent so as to perform a thorough cleaning of the area about the threads 11 and the surface 12. As threads 11 of the medical implement 30 continue to be rotationally inserted into the threads 3 of the housing, the distal end surface 12 is automatically scrubbed by surface 50 of the second cleaning material 8 and cleaned by cleaning agent held therein, and at least a portion of the side and threads 11 of the medical

6

implement 30 are automatically scrubbed by radial compression of the first cleaning material 7 and cleaned by a cleaning agent held therein. FIG. 4 illustrates the disinfecting cap 10 with a fully inserted medical implement 30.

The cap 10 can be removed immediately from the medical implement 30 after use, or be kept in place. If the cap 10 is removed the medical implement 30 surfaces 11 and 12 will be clean and ready for use upon the drying of the cleaning agent. If the cap 10 is kept secured to medical implement 30, the cleaning agent in cap 10 will evaporate over time thereby destroying any microorganisms on the surfaces 12 and 11 of medical implement 30. The cap 10 then maintains the surfaces 11 and 12 of medical implement 30 in a clean and ready-to-access state by eliminating any forms of touch contamination.

FIGS. 5-10 illustrate an alternate embodiment of a cleaning device 100. FIG. 5 is a perspective view of the cleaning device 100 formed of a cap 102 with a seal 104 that is connected to and covers the opening of the cap 102. The cap 102 can have a number of gripping ridges or projecting members for ease of use. FIG. 6 is a cross-sectional view of the cleaning device 100. The cap 102 forms an inner cavity with one opening that is large enough to receive a site of a medical implement. The seal 104 is affixed to the opening and is preferably entirely removable. In other embodiments, the seal 104 is permanently affixed, and is simply punctured by insertion of a site of a medical implement.

The cap 102 houses a threaded ring 106 proximate to the opening. The threaded ring 106 includes one or more threads 105 and is adapted to receive the site of the medical implement to be disinfected, and thus defines the size and shape of the opening. This embodiment is advantageous because it creates a single circumferential seal point, seal 104 to the opening of cap 102.

In some embodiments, the cap 102 and threaded ring 106 are formed of a unitary piece of material or cleaning material. In other embodiments, the threaded ring 106 fits into a groove 109 that is formed in the inside edge surface of the cap 102 near the opening. In this latter configuration, the groove 109 maintains the position of threaded ring 106 near the open end of the cap where the threaded ring top surface may be flush with or slightly recessed from the cap open end walls, and the threaded ring 106 may also include or create with the cap wall a small vent aperture or opening to allow evaporation of a cleaning agent in the cap 102. The threaded ring 106 can be mechanically kept from rotating with internal ribs or protrusions in cap 102 or groove 109. Threaded ring 106 may be held in place within grove 109 and cap 102 by glue, welding, snap-fit, solvent bonding or any other mechanism or composition known to those of requisite skill.

The cleaning device 100 further includes a first cleaning material 107 that holds the cleaning agent, such as isopropyl alcohol, and a second cleaning material 108 that also holds or is at least partially saturated by the cleaning agent. In preferred exemplary embodiments, the first cleaning material 107 is formed as a hollow cylinder or ring positioned between the threaded ring 106 and the top inside surface of the cap 102, and is adapted for radial compression against a site that is inserted into the cap 102 or over which the cap 102 is placed. In some embodiments, the second cleaning material 108 is formed as a solid cylinder and positioned within the hollow space of the first cleaning material 107, and is adapted for axial compression against a leading edge of the site that is inserted into the cap 102 or over which the cap 102 is placed. In other embodiments, cleaning materials 107 and 108 can be made of a single piece of material and cut or formed so as to achieve the same result as described above. The cleaning

7

agent is provided to the cleaning materials **107**, **108** prior to the opening being covered with the seal **104**.

FIG. **7** is a bottom perspective view and FIG. **8** is a cross-sectional view of the cleaning device **100** with the seal **104** removed, showing the cap **102**, threaded ring **106** that sits within the cap **102**, and the second cleaning material **108** inside the cap **102**. The second cleaning material **108** can extend to and slightly beyond the opening of the cap **102**. FIG. **8** further shows the first cleaning material **107** that circumscribes the second cleaning material **108** and being positioned between the threaded ring **106** and the top inner surface of the cap **102**. FIG. **11** illustrates an example of the threaded ring **106** and its threads **105**. An attribute of this embodiment of the threaded ring **106** shown in FIG. **11** is that there are only two opposing threads that travel 180 degrees before terminating. This enables the molding of threaded ring **106** without the use of a screw to create the thread feature in an injection molding tool. The threaded ring **106** can also be produced with an injection molding tool utilizing a screw.

FIG. **9** illustrates the cleaning device **100** about to make contact with a site **120** of a medical implement. As discussed above, the site **120** can be a luer port, a, a needle free valve, an injection port of a vessel, or other medical implement that needs to be cleaned prior to use with a patient. In some embodiments, the site **120** can include a set of threads **122** that correspond to the threads **105** in the threaded ring **106** of the cleaning device **100**. The cleaning materials **107** and **108** are preloaded with a cleaning agent, before removal of the seal and contact by the site **120**. Accordingly, as shown in FIG. **10**, the site **120** makes contact with the cap **102** by a screwing motion relative to the cap **102**. The second cleaning material **108** is compressed axially and swabs against the leading edge of the site **120**, while the first cleaning material **107** is compressed radially and swabs against sides of the site **120**.

FIG. **11** illustrates the molded thread ring **106** with two opposing threads **105** that traverse opposing 180 degree portions of the ring. This design enables the thread ring **106** to be molded without the use of a screw that is typically used to create threaded parts in a molding process. Thus the threaded ring **106** can be manufacture very inexpensively. The threaded ring **106** can also clean some of the threads when the cap is placed into position, and may or may not cover all the threads. In some embodiments, the threaded ring **106** can be molded from the cleaning material, or the cleaning material is formed only of the threaded ring **106**. In such embodiments, the cleaning may only occur on threads of the site and in an axial direction.

FIG. **12** shows an alternative embodiment of a cleaning device **130** having a cap **132** that is filled with a cleaning material. The cap **132** has side walls **134** and a top **136** that define an inner cavity with an opening **132**. The cleaning material includes at least a first cleaning material **138**, such as cotton or foam, that delivers a cleaning agent. The cleaning material can include a second cleaning material **140** to hold more cleaning agent. In some embodiments, the second cleaning material **140** can be circumscribed by the first cleaning material **138**. Alternatively, the first cleaning material **138** can completely envelope the second cleaning material **140**, each providing their own compressibility and capacity to hold a cleaning agent. Still, in other embodiments, the first and second cleaning materials **138**, **140** can be formed of a single piece of material. The cleaning material(s) are filled at least partially with a cleaning agent, prior to sealing of the opening **132** with a seal and closure of the inner cavity.

FIG. **13** shows an alternate embodiment of a cleaning device **150**. In this embodiment, the cleaning device **150**

8

includes a housing **152** that is formed as a threaded cap. The inner surface of the housing **152** is covered, at least in part, by a cleaning layer **154** that is bonded to the inner surface of the housing **152**. The cleaning layer **154** can be a cleaning material such as cotton, foam, or other porous and pliable material that suitably holds and/or delivers a cleaning agent such as isopropyl alcohol. The cleaning layer **154** is sized and positioned inside the housing **152** so as to be able to swab the top and a portion of the sides of a part of a medical implement that is inserted therein, or over which the housing **152** is placed. Accordingly, the cleaning layer **154** can have any thickness or compressibility.

FIG. **14** shows yet another alternative embodiment of a cleaning device **160**, illustrating an outer view of a rounded housing **162** for an expanded inner chamber to hold more cleaning agents or cleaning materials that hold such agents. Holes **164** in the housing **162** can promote evaporation of the cleaning agent, particularly when the housing covers a site of a medical implement to be disinfected. The location of the vent holes is variable and the vent holes can also be sealed with a filter type membrane that permits the drying of the cleaning agents but does not allow entry of microorganisms or fluid.

The use of the various implementations and embodiments above entails the following: the healthcare worker would, with gloved hands, open the foil package and place this cap over the site of a medical implement to be cleaned. Upon placement the alcohol soaked cleaning material wipes all of the port's surfaces. This wipe could be accomplished by either a turning motion (if threads are used) or by simply pushing the cap onto the port. In this way the cap eliminates errors in the practice of swabbing due to poor training or excessive workloads. The cap would then remain secured in place by threads, mechanical tension provided by the foam, cotton, etc., snaps or some other mechanism. A cap in place on a medical implement is a positive indication that a desired site of the medical implement is clean. A vibrant color may be used to allow instant visualization of a cap's presence from a door or hallway. ICP's can review compliance by merely observing sites to see whether or not a cap is in place. The cap could remain in place for periods of up to three days or more. For extended periods the alcohol will likely evaporate, which assures that the site is clean. With the cap in place, it continues to keep the site clean even after the alcohol has evaporated.

Although a few embodiments have been described in detail above, other modifications are possible. For instance, any of the embodiments described above may be sized and scaled for a particular medical implement, such as a stethoscope. Other embodiments may be within the scope of the following claims.

The invention claimed is:

**1**. A cleaning device for a medical implement, the cleaning device comprising:

a cap having an opening to an inner cavity, the opening for receiving a site of the medical implement;

one or more protrusions extending inwardly at least partially around an inside surface of the cap near a periphery of the opening to the inner cavity, the one or more protrusions to engage an outer surface of the site of the medical implement to maintain the cap on the site of the medical implement;

a cleaning agent that occupies at least some of the inner cavity, the cleaning agent being formulated to clean the site when the opening of the cap receives the site of the medical implement;

US 8,206,514 B2

9                                              10

at least one aperture to the inner cavity to allow venting from the inner cavity when the opening of the cap receives the site of the medical implement; and

a removable seal that covers the opening to maintain the cleaning agent within the inner cavity prior to receipt of the site of the medical implement.

**2**. The cleaning device in accordance with claim **1**, wherein the at least one aperture is transiently formed during receiving the site of the medical implement.

**3**. The cleaning device in accordance with claim **1**, wherein the at least one aperture is transiently formed as a gap between at least one of the one or more protrusions and an outer surface of the site of the medical implement.

**4**. The cleaning device in accordance with claim **1**, wherein the at least one aperture is a gap between at least one of the one or more protrusions and an outer surface of the site of the medical implement.

**5**. The cleaning device in accordance with claim **1**, wherein the venting from the inner cavity includes venting of at least a portion of the cleaning agent.

**6**. The cleaning device in accordance with claim **1**, wherein the venting from the inner cavity includes releasing pressure from the inner cavity.

**7**. The cleaning device in accordance with claim **1**, wherein the at least one aperture is proximate the one or more protrusions.

**8**. The cleaning device in accordance with claim **1**, wherein the removable seal is connected to the opening prior to being removed.

**9**. The cleaning device in accordance with claim **1**, wherein the at least one aperture is a gap in the one or more protrusions.

**10**. The cleaning device in accordance with claim **9**, wherein the gap in the one or more protrusions is formed between an inner surface of the one or more protrusions and an outer surface of the site of the medical implement.

**11**. A cleaning device for a medical implement having a threaded access port, the cleaning device comprising:

a cap having an inner cavity for receiving the threaded access port of the medical implement;

a protrusion extending inwardly at least partially around an inside surface of the cap near a periphery of the opening to the inner cavity, the protrusion to engage at least a portion of the threaded access port of the medical implement to maintain the cap on the medical implement;

a cleaning agent that occupies at least some of the inner cavity, the cleaning agent being formulated to clean the threaded access port when the opening of the cap receives the threaded access port of the medical implement;

at least one aperture to the inner cavity to allow venting from the inner cavity when the inner cavity receives the threaded access port of the medical implement; and

a removable seal that covers the opening to maintain the cleaning agent within the inner cavity prior to receipt of the site of the medical implement.

**12**. The cleaning device in accordance with claim **11**, wherein the at least one aperture is transiently formed when the inner cavity receives the threaded access port of the medical implement.

**13**. The cleaning device in accordance with claim **11**, wherein the venting from the inner cavity includes venting of at least a portion of the cleaning agent.

**14**. The cleaning device in accordance with claim **11**, wherein the venting from the inner cavity includes releasing pressure from the inner cavity.

**15**. The cleaning device in accordance with claim **11**, wherein when the inner cavity receives the threaded access port of the medical implement, at least a portion of threads of the threaded access port are exposed to the cleaning agent.

**16**. The cleaning device in accordance with claim **11**, wherein when the inner cavity receives the threaded access port of the medical implement, at least a portion of threads of the threaded access port extend beyond the protrusion and into the inner cavity.

**17**. The cleaning device in accordance with claim **11**, further comprising a compressible cleaning material in the inner cavity and containing the cleaning agent, the compressible cleaning material adapted to swab and clean the threaded access port with the cleaning agent.

**18**. The cleaning device in accordance with claim **11**, wherein the at least one aperture is transiently formed by a gap between the protrusion and the threaded access port of the medical implement.

**19**. The cleaning device in accordance with claim **11**, wherein the at least one aperture is a gap in the protrusion.

**20**. The cleaning device in accordance with claim **19**, wherein the gap in the protrusion is formed between an inner surface of the protrusion and an outer surface of the threaded access port of the medical implement.

**21**. A method for cleaning a threaded access port of a medical implement, the method comprising:

providing a cleaning device comprising a cap having an inner cavity for receiving the threaded access port, a protrusion extending inwardly at least partially around an inside surface of the cap near a periphery of the opening to the inner cavity to engage at least a portion of the threaded access port, a cleaning agent that occupies at least some of the inner cavity and being formulated to clean the threaded access port when the opening of the cap receives the threaded access port, at least one aperture to the inner cavity to allow venting from the inner cavity when the inner cavity receives the threaded access port, and a seal that covers the opening to maintain the cleaning agent within the inner cavity prior to receipt of the site of the medical implement;

removing the seal to expose the opening to the threaded access port; and

placing the cap on the threaded access port to contact the threaded access port with the cleaning agent.

**22**. The method in accordance with claim **21**, further comprising venting the inner cavity via the at least one aperture after the cap is placed on the threaded access port.

**23**. The method in accordance with claim **21**, wherein the at least one aperture is transiently formed when the cap covers the threaded access port of the medical implement.

**24**. The method in accordance with claim **21**, wherein the venting includes venting the cleaning agent from the inner cavity.

**25**. The method in accordance with claim **21**, wherein the protrusion includes a thread at the opening to the inner cavity of the cap.

**26**. The method in accordance with claim **21**, wherein the at least one aperture is a gap in the protrusion.

**27**. The method in accordance with claim **21**, further comprising engaging the threaded access port with the protrusion.

**28**. The method in accordance with claim **26**, wherein the gap in the protrusion is formed between an inner surface of the protrusion and an outer surface of the threaded access port of the medical implement.

**29**. A cleaning system for a plurality of medical implements, the cleaning system comprising:

a strip of sealing material; and

US 8,206,514 B2

11

a plurality of cleaning devices removably attached to the strip of sealing material, each cleaning device being attached such that the sealing material encloses an inner cavity to each cleaning device, each inner cavity having an opening for receiving a site of one of the plurality of medical implements upon removal from the strip of sealing material, each cleaning device further comprising:

one or more protrusions extending inwardly at least partially around an inside surface of the cap near a periphery of the opening to the inner cavity, the one or more protrusions to engage an outer surface of the site of one of the plurality of medical implements to maintain the cap on the site of one of the plurality of medical implements;

a cleaning agent that occupies at least some of the inner cavity, the cleaning agent being formulated to clean the site when the opening of the cap receives the site of one of the plurality of medical implements; and

at least one aperture to the inner cavity to allow venting from the inner cavity when the opening of the cap receives the site of one of the plurality of medical implements.

**30**. The cleaning system in accordance with claim **29**, wherein each cleaning device further comprises a cap having ridges for being gripped by a user to position the cleaning device on the site of one of the plurality of medical implements.

**31**. The cleaning system in accordance with claim **29**, wherein the at least one aperture of each cleaning device is

12

transiently formed during receiving the site of one of the plurality of medical implements.

**32**. The cleaning system in accordance with claim **29**, wherein the at least one aperture of each cleaning device is transiently formed as a gap between at least one of the one or more protrusions and an outer surface of the site of one of the plurality of medical implements.

**33**. The cleaning system in accordance with claim **29**, wherein the at least one aperture of each cleaning device is a gap in the one or more protrusions.

**34**. The cleaning system in accordance with claim **29**, wherein the venting from the inner cavity of each cleaning device includes venting of at least a portion of the cleaning agent.

**35**. The cleaning system in accordance with claim **29**, wherein the venting from the inner cavity of each cleaning device includes releasing pressure from the inner cavity.

**36**. The cleaning system in accordance with claim **29**, wherein the at least one aperture of each cleaning device is proximate the one or more protrusions of each cleaning device.

**37**. The cleaning system in accordance with claim **33**, wherein the gap in the one or more protrusions is formed between at least one of the one or more protrusions and an outer surface of the site of one of the plurality of medical implements.

*    *    *    *    *

# United States Court of Appeals
## for the Federal Circuit

*Ivera Medical Corporation v. Excelsior Medical Corporation,* 2014-1609

## CERTIFICATE OF SERVICE

I, Daniel H. Bromberg, being duly sworn according to law and being over the age of 18, upon my oath depose and say that on **October 24, 2014,** I electronically filed the foregoing **Brief for Plaintiff-Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

John E. Flaherty (principal counsel)
Michael R. Friscia
Mark H. Anania
Matthew A. Sklar
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
Tel: (973) 622-4444
Fax: (973) 297-3971
Email: jflaherty@mccarter.com
*Attorneys for Defendant-Appellee*
*Excelsior Medical Corporation*

Edward F. O'Connor
(principal counsel)
THE ECLIPSE GROUP LLP
550 West C Street, Suite 2040
San Diego, California 92101
Tel: 619.239.4340
Fax: 619.239.0116
Email: efo@eclipsegrp.com
*Attorneys for Defendant-Appellee*
*Catheter Connections, Inc.*

Adam R. Hess (principal counsel)
Paul F. Strain
Marty L. Saad
Meaghan H. Kent
VENABLE, LLP
575 7th Street, NW
Washington DC, 20004
Telephone: 202.344.4000
Facsimile: 202.344.8300
*Attorneys for Defendant- Appellee*
*Hospira, Inc.*

Upon acceptance by the Court of the e-filed document, I will cause six paper copies to be filed with the Court within the time provided in the Court's rules.

October 24, 2014                                        /s/ Daniel H. Bromberg
                                                        Counsel for Appellant